United States Court of Appeals,
Fifth Circuit.

No. 91-3437.

CHEVRON U.S.A., INC., Plaintiff-Appellee, Cross-Appellant,

v.

TRAILLOUR OIL COMPANY, et al., Defendants,

v.

Earl Harvey ARCHER, III, et al., Defendants-Appellants, Cross-Appellees.

April 8, 1993.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before VAN GRAAFEILAND,[*] KING, and EMILIO M. GARZA, Circuit Judges.

KING, Circuit Judge

Chevron U.S.A., Inc., filed this diversity suit in federal district court against various defendants, all of whom are successors in interest to Chevron's lease of the Bayou Couba Field in Louisiana. Chevron sought a declaratory judgment that each of the defendants must (i) provide it with a $2 million letter of credit to secure Chevron's plug and abandon obligations with respect to the Bayou Couba lease and (ii) indemnify it for any plug and abandon obligations it may be required to fulfill. The district court granted the defendants' motion for summary judgment with respect to Chevron's letter of credit claims, but granted Chevron's motion for summary judgment with respect to the underlying plug and abandon indemnity claims. Chevron appeals from the portion of the district court's order dismissing its letter of credit claims, and the defendants appeal from the portion of the district court's order declaring that they must indemnify Chevron for any subsequently incurred plug and abandon obligations. For the following reasons, we affirm the district court's decision in part and reverse the district court's decision in part.

## I. BACKGROUND

In January of 1984, Gulf Oil Corporation, now Chevron, was the lessee of an oil and gas lease

[*]Senior Circuit Judge, of the Second Circuit, sitting by designation.

covering the Bayou Couba Field in Louisiana. Numerous wells had been drilled on the leased premises, but the field continued to produce. Consequently, many of the wells had not yet been plugged and abandoned. Gulf was concerned about this situation, because under its lease,[1] as well as under Louisiana law, it appeared that Gulf would eventually be obligated to plug and abandon these wells. Weighing the benefits of continued production against the cost of future plug and abandon obligations, Gulf decided to sell the lease. In selling the lease, Gulf sought to rid itself of any future obligation to plug and abandon the wells on the Bayou Couba lease.

A. The Assignment from Gulf to Traillour, Marsh, and Rocky Mountain and the Initial Letter of Credit

On January 13, 1984, Traillour Oil Company ("Traillour") and Marsh Engineering, Inc. ("Marsh") submitted a written offer to Gulf to acquire the Bayou Couba lease and plug and abandon the wells on that lease. The offer provided, in pertinent part:

> Traillour Oil Company and Marsh Engineering, Inc. propose to take over operations in the Gulf, Bayou Couba Field with the expressed purpose of plug and abandonment or re-establishing commercial production. Traillour/Marsh makes this proposal with the precise knowledge that all of these wells will have to be plugged and abandoned if commercial production is not established....

> Traillour/Marsh makes its offer as follows:

> 1. For the sum of $1,101,101.00 and the implied costs of plug and abandonment and clean-up, Gulf Oil Corporation assigns to Traillour/Marsh all of their rights, as defined in the attached [lease] documents, to the Bayou Couba Field, the wellbores, and production equipment on an as is basis.

> 2. ... As further consideration of its guarantee, that all the wells will be subsequently plugged and abandoned in suitable form, Traillour/Marsh will present an irrevocable letter of credit for the sum of two million dollars ($2,000,000.00) to Gulf on the date that a mutually acceptable transfer of ownership agreement is signed.... This requirement for a letter of credit will expire 30 days after Gulf Oil Corporation has been released by the state of Louisiana and the surface owners of any present, past, or future occurrences or liabilities concerning the Bayou Couba Property as assigned by Gulf to Traillour/Marsh.

> 3. Traillour/Marsh agrees to plug and abandon these wells according to the Louisiana Conservation Agency Rules and Regulations, to remove all production equipment and associated hardware and to return the well sites and production area to a form suitable to the present landowner.

---

[1] The 1941 oil and gas lease between Delta Securities Company (lessor) and Gulf Oil Corporation specifically provided: "Gulf shall ... plug and abandon all wells on the released and surrendered acreage in accordance with the rules and regulations of any government, agency, official or department having jurisdiction."

Gulf accepted the offer submitted by Traillour and Marsh, subject to (a) the execution of a mutually acceptable assignment and (b) Traillour and Marsh's ability to acquire a $2 million performance bond or irrevocable letter of credit to secure the plug and abandon obligations. Neither the offer by Traillour and Marsh nor the acceptance by Gulf was recorded in the public records.

After Gulf had accepted the offer by Traillour and Marsh, Traillour entered into a side agreement with Rocky Mountain Resources, Ltd. ("Rocky Mountain"), so that the acquisition of the Bayou Couba lease could proceed. Apparently, Traillour did not have the money for the cash bid or the capacity to acquire the letter of credit to secure the plugging and abandoning of the wells as required by the bid specifications. To obtain the money and the letter of credit, Traillour agreed to transfer 90% of the interest it was to acquire in the Bayou Couba lease before payout, as well as 83% of the interest it was to acquire after payout, to Rocky Mountain. In return, Rocky Mountain agreed to provide the $1,101,101.00 necessary for the cash bid and "[a] $2,000,000.00 standby letter of credit to secure the plugging and abandoning of the wells in the Bayou Couba Field." The agreement further noted that the letter of credit "shall be made available for the benefit of Traillour at the closing of the purchase of the Bayou Couba field." This side agreement was recorded in the public records.

In April 1984, the parties closed the sale of the Bayou Couba lease. Gulf was presented with $1,101,101.00 cash and a $2 million irrevocable letter of credit issued by a Texas bank and payable to Gulf on order of Traillour. The letter of credit provided, among other things, that:

> 5. This letter of credit ... shall remain in full force and effect for eighteen (18) months, with reduction provided in Paragraph 3, *supra,* unless [Gulf] has been released by the State of Louisiana and the surface owners of any present, past, or future liability to properly plug and abandon the wells identified on Exhibit "A" hereof and for failure to restore the acreage ... to as close to its original condition as is reasonably practicable; provided however, that before termination of said Letter of Credit, [Traillour and Marsh] shall either furnish [Gulf] another Letter of Credit as provided herein or pay the amount of said Letter of Credit, reduced as provided herein, into an escrow account. Such evidence shall be in the form of a letter in writing accompanied by such releases and acknowledged by Gulf.

Gulf, in return, transferred its entire interest in the Bayou Couba lease to Traillour, Marsh, and Rocky Mountain.[2] According to the assignment document, Traillour, Marsh, and Rocky Mountain agreed

---

[2]On the same day that Gulf transferred its entire interest in the Bayou Couba lease to Traillour, Marsh, and Rocky Mountain, Traillour and Marsh—in accordance with the side agreement—transferred to Rocky Mountain a 90% interest in the lease before payout and an 83%

"to promptly plug and abandon all the wells described in Exhibit B [the pre-existing wells on the lease] as well as any wells drilled by Traillour et al under the terms of the lease."  Moreover, the "entire costs, expense and risk of plugging and abandoning the ... wells" was to be borne by Traillour, Marsh, and Rocky Mountain.  This document, which clearly obligated the assignees to plug and abandon the wells on the Bayou Couba lease, was promptly recorded.

B. Subsequent Transfers and Renewals of the Letter of Credit

Shortly after the original assignment from Gulf, Rocky Mountain decided to dispose of its interest in the Bayou Couba lease.  Rocky Mountain therefore agreed to transfer all of its substantial interest in the lease back to Traillour.  According to the assignment document, Traillour agreed to assume all obligations and formal duties resulting from the ownership of the Bayou Couba lease.  In addition, Traillour agreed to promptly plug and abandon all of the wells on the lease and to bear the entire cost, expense, and risk of plugging and abandoning the wells on the lease.  Gulf did not sign this assignment, nor did it ever sign a separate document agreeing to the terms of the assignment.

The transfer back to Traillour, however, was not to take effect until the letter of credit previously obtained by Rocky Mountain for Traillour's benefit had been released or cancelled by Gulf.  To effect the transfer, Traillour solicited twenty-six new investors, who together with Traillour were able to obtain another irrevocable $2 million letter of credit from Calcasieu Marine National Bank in favor of Gulf ("LOC 465").  LOC 465 was substantially similar to the letter of credit previously issued by the Texas bank:  it was for a fixed term of eighteen months and it stated that Traillour and the investors, before the letter terminated, were to furnish Gulf with a new letter of credit or pay the amount of the letter of credit into an escrow account.  When Gulf received LOC 465, it released the letter of credit previously procured by Rocky Mountain.  Thereafter, Rocky Mountain's conveyance of its entire interest in the Bayou Couba lease to Traillour became effective.

Traillour, in turn, transferred various undivided interests in the Bayou Couba lease to the twenty-six investors who had helped Traillour obtain LOC 465.  One of the twenty-six investors transferred its interest back to Traillour, and Traillour then transferred that interest to eleven new

interest in the lease after payout.

investors. In each of these transfers, the investors agreed to "assume all obligations and perform all duties resulting from the ownership of the Subject Interest conveyed hereby or imposed by any governmental authority asserting jurisdiction over the lands covered by the Lease." Each investor also agreed to "comply with all of the express and implied covenants and conditions of the [Bayou Couba] lease." Finally, each investor agreed to bear his "proportionate cost, expense and risk of plugging and abandoning the above described wells, cleanup operations and any other operations provided for under the [Bayou Couba] lease ... in proportion to [his] working interest." Neither Gulf nor Rocky Mountain signed any of these agreements.

C. Letter of Credit No. 554

In May 1986, shortly before LOC 465 expired, Chevron, which had merged with Gulf in July 1985, wrote Calcasieu Marine National Bank and requested that the letter of credit be renewed for a period of two years. The investors and Traillour apparently opposed a two-year extension, however, so Chevron agreed to a one-year extension of the letter of credit. On order of the investors and Traillour, then, Calcasieu Marine issued a new irrevocable letter of credit ("LOC 554"), naming Chevron as obligee, to replace LOC 465. Paragraph 5 of LOC 554, which was substantially similar to provisions in the previous letters of credit, provided as follows:

> This letter of credit or any assignment thereof shall remain in full force and effect until, and shall expire and terminate on June 11, 1987, with reduction as provided in Paragraph 3 *supra,* unless [Chevron], prior to the expiration of this Letter of Credit on June 11, 1987, has been released by the State of Louisiana and the surface owners of any present, past or future liability to properly plug and abandon the wells identified on Exhibit "A" hereof and for failure to restore acreage ... to as close to its original condition as is reasonably practicable; provided however, that before termination of said Letter of Credit, Principals [Traillour and investors] shall either furnish [Chevron] another Letter of Credit as provided herein or pay the amount of said Letter of Credit, reduced as provided herein into an escrow account. Such evidence shall be in the form of a letter in writing accompanied by such releases and acknowledged by Chevron.

Meanwhile, each of the investors signed similar continuing guaranties in favor of Calcasieu Marine. The guaranties permitted the bank to grant extensions of its letter of credit in favor of Chevron. Moreover, each investor agreed to be responsible *in solido,* or jointly and severally, to the bank for full payment of any funds the bank might be required to pay.

Chevron did not request an extension of LOC 554 until June 22, 1987, apparently because

of an internal company error. By that time, however, the letter of credit had expired by its own terms. And, neither Traillour nor the investors would comply with Chevron's request to furnish a replacement letter of credit or pay the amount required by LOC 554 into escrow.

## D. Chevron's Lawsuit to Obtain a Replacement Letter of Credit and Define the Scope of Plug and Abandon Obligations

In February 1989, Chevron filed suit against Rocky Mountain, Traillour, Marsh, and the investors who were principals to LOC 465 and LOC 554.[3] In an amended complaint, Chevron dropped its claims against Marsh and one investor and added a claim against Calcasieu Marine. Chevron sought alternatively (i) a declaratory judgment against Calcasieu Marine that LOC 554 was still in effect or (ii) an order directing Rocky Mountain, Traillour, or the investors to furnish it with an irrevocable letter of credit.

Chevron and Calcasieu Marine filed cross-motions for summary judgment with respect to Chevron's claim that LOC 554 was still in effect. The district court granted summary judgment in favor of Calcasieu Marine, holding that LOC 554 expired on its stated expiration date of June 11, 1987. On appeal, this court affirmed. *Chevron U.S.A., Inc. v. Traillour Oil Co.,* 934 F.2d 1260 (5th Cir.1991) (unpublished opinion) ("*Chevron I* "). We reasoned that paragraph 5 of LOC 554, which appeared to require Traillour and the investors to either replace the letter of credit or pay the specified amount of money into escrow, did not function to extend the expiration date. Thus, we agreed with the district court that LOC 554 expired by its own terms on June 11, 1987.

While the appeal in *Chevron I* was pending, however, the parties filed cross-motions for summary judgment with respect to Chevron's other letter of credit claims—i.e., the claims that Rocky Mountain and the investors are required to provide Chevron with a new letter of credit to secure the plug and abandon obligations that ran with the Bayou Couba lease.[4] Chevron also raised a new claim in its motion for summary judgment. In particular, Chevron sought a declaratory judgment that

---

[3]Chevron had filed an earlier action, but it was dismissed because complete diversity of citizenship was lacking.

[4]Chevron did not file a motion for summary judgment with respect to Traillour, apparently because Traillour was bankrupt.

Rocky Mountain and the investors are responsible *in solido,* or jointly and severally, to Chevron for all plug and abandon obligations running with the Bayou Couba lease. Thereafter, Chevron amended its complaint to request such relief.

The district court ruled on the remaining motions for summary judgment on January 31, 1991. The district court first granted summary judgment in favor of Rocky Mountain and the investors on Chevron's letter of credit claims. It determined that Chevron is estopped from enforcing defendant Rocky Mountain's promise to continue providing letters of credit, and it concluded that the other defendant investors have no obligation to Chevron to continue to provide such letters of credit. The district court granted summary judgment in favor of Chevron, however, with respect to Chevron's plug and abandon claims. It specifically held that Rocky Mountain, because it assumed Chevron's plug and abandon obligations in the assignment from Gulf, is liable *in solido* to indemnify Chevron for the plug and abandon obligations. The district court further held that the investors are required to indemnify Chevron *in solido* for any future plug and abandon obligations.

The district court therefore dismissed Chevron's letter of credit claim against Rocky Mountain and the investors, but issued a declaratory judgment that Rocky Mountain and the investors owe Chevron indemnity *in solido* for any plug and abandon obligations running with the Bayou Couba lease. These appeals followed.

## II. SCOPE AND STANDARD OF REVIEW

In reviewing a summary judgment, we apply the same standard as the district court. *Waltman v. International Paper Co.,* 875 F.2d 468, 474 (5th Cir.1989). We ask specifically whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). In answering the first part of this question, we view all evidence and the inferences to be drawn from the evidence in the light most favorable to the party opposing the motion. *Marshall v. Victoria Transp. Co.,* 603 F.2d 1122, 1123 (5th Cir.1979) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). Questions of law, on the other hand, are subject to de novo review. *Netto v. Amtrak,* 863 F.2d 1210,

1212 (5th Cir.1989).

In our review of a district court's decision to grant a motion for summary judgment, we will affirm that decision if, after examining the entire record, we are convinced that the standard set forth in Federal Rule of Civil Procedure 56(c) has been met. *See id.* Where, as here, the movants for summary judgment advanced several independent arguments in district court in support of their motions for summary judgment, we will affirm if any of those grounds support the district court's decision. Thus, in our review of the district court's partial grants of summary judgment in this case, we are not bound by the grounds articulated by the district court; instead, we may affirm the district court's judgment on other appropriate grounds. *See Coral Petroleum, Inc. v. Banque Paribas-London,* 797 F.2d 1351, 1355 n. 3 (5th Cir.1986) (citing *Davis v. Liberty Mut. Ins. Co.,* 525 F.2d 1204, 1207 (5th Cir.1976)).

## III. ANALYSIS

Our review of the district court's judgment proceeds in two parts. We first review the portion of the district court's decision awarding summary judgment in favor of Rocky Mountain and the investors on Chevron's letter of credit claims. We then review the portion of the district court's decision granting summary judgment in favor of Chevron on the underlying plug and abandon indemnity claims.

A. The Letter of Credit Claims

On appeal, Chevron argues that the district court erred in awarding summary judgment to Rocky Mountain and the investors on its letter of credit claims. Chevron argues that Rocky Mountain is obligated to keep in force a letter of credit in favor of Chevron until all wells on the Bayou Couba lease have been plugged and abandoned and that the district court erred in holding that Chevron is estopped from enforcing this obligation. Chevron further contends that the investors, either as successors in interest to Rocky Mountain or under the terms of LOC 554, are obligated to furnish Chevron with a replacement letter of credit. We address each of these contentions in turn.

1. *The Claim Against Rocky Mountain*

The district court held that, under the undisputed facts of the case, Rocky Mountain is not

required to furnish Chevron with a replacement letter of credit. In so holding, the district court first reasoned that Rocky Mountain made a *stipulation pour autrui,* or a promise for the benefit of a third party, in favor of Chevron to keep in force a letter of credit until thirty days after Chevron was finally released of all plug and abandon obligations. The district court further reasoned, however, that Chevron, because of its conduct, is estopped from enforcing the *stipulation pour autrui.*

On appeal, the parties complain about different parts of the district court's reasoning. Chevron challenges only the latter part of the district court's reasoning—namely, that it is estopped from enforcing Rocky Mountain's *stipulation pour autrui.* Chevron agrees with the district court's conclusion that Rocky Mountain made a *stipulation pour autrui* to continue providing it with letters of credit.

Rocky Mountain, on the other hand, agrees with the latter part of the district court's reasoning—that it is entitled to summary judgment on grounds of estoppel. In the alternative, however, Rocky Mountain contends that the district court erred in concluding that it made a *stipulation pour autrui* in favor of Chevron to keep in force a letter of credit securing plug and abandon obligations. Rocky Mountain's argument in the latter regard is two-fold: First, Rocky Mountain contends that the side agreement it made with Traillour does not constitute a *stipulation pour autrui,* or a promise in favor of a third party, under Louisiana law. Second, Rocky Mountain contends that, even if the side agreement can be construed as a *stipulation pour autrui,* it cannot be construed as a promise to continue providing Chevron with replacement letters of credit until thirty days after Chevron has been released from its plug and abandon obligations.

We agree with Rocky Mountain that the district court correctly granted summary judgment in its favor; however, we affirm the district court's judgment on other grounds. Contrary to the district court's conclusion, we hold that Rocky Mountain never made a *stipulation pour autrui* in favor of Chevron to keep a letter of credit in force. Therefore, we do not reach Rocky Mountain's estoppel argument.[5]

---

[5]We note, however, that there is a serious question as to whether equitable estoppel was appropriately applied in this case. As discussed *infra* Part III.B.1(b), equitable estoppel requires a representation by the party to be estopped, as well as justifiable and detrimental reliance by the

(a) Did Rocky Mountain, in its side agreement with Traillour, make a *stipulation pour autrui* in favor of Chevron?

The Louisiana Civil Code provides that "[a] contracting party may stipulate a benefit for a third person called a third party beneficiary." LA.CIV.CODE ANN. art. 1978 (West 1987). However, such a promise, or a *stipulation pour autrui,* "is never presumed. Rather, the intent of the contracting parties to stipulate a benefit in favor of a third party must be made manifestly clear." *Homer Nat'l Bank v. Tri-District Dev. Corp.,* 534 So.2d 154, 156 (La.App. 3d Cir.1988), *writ denied,* 536 So.2d 1236 (La.1989). As we stated in *New Orleans Public Service, Inc. v. United Gas Pipe Line Co.,* 732 F.2d 452 (5th Cir.) (en banc), *cert. denied sub nom. Morial v. United States Gas Pipe Line Co.,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984):

> Louisiana law is settled that for there to be a *stipulation pour autrui* there must be not only a third-party advantage, but the benefit derived from the contract by the third party may not merely be incidental to the contract. Rather, the third-party benefit must form the condition or consideration of the contract in order for it to be a *stipulation pour autrui.* Moreover, a *stipulation pour autrui* will be found only when the contract *clearly* contemplates the benefit to the third person as its condition or consideration.

732 F.2d at 467 (internal quotations and citations omitted).

In this case the district court concluded that Rocky Mountain, in its side agreement with Traillour, unambiguously made a *stipulation pour autrui* in favor of Chevron to keep in force a letter of credit to secure the plug and abandon obligations. In reaching this conclusion, the district court relied on the undisputed facts that: (1) at the time the side agreement was executed between Rocky Mountain and Traillour, Traillour had offered to furnish Chevron with a letter of credit until thirty days after Chevron had been released from any plug and abandon obligations; (2) in the prefatory recitals of the side agreement, Rocky Mountain expressly acknowledged that it had agreed "to provide the cash bid and required letter of credit to secure the plugging and abandoning of the wells in the Bayou Couba Field"; and (3) in the side agreement itself, Rocky Mountain agreed to provide "[a] $2,000,000.00 standby letter of credit to secure the plugging and abandoning of the wells in the

---

party asserting the estoppel defense. The only conduct by Chevron that arguably could have constituted a "representation" is its release of the letter of credit obtained by Rocky Mountain. Moreover, there may be a fact question as to whether Rocky Mountain justifiably relied on the release to its detriment.

Bayou Couba Field." From these undisputed facts, the district court held that "Rocky Mountain was agreeing to assume the same letter-of-credit obligations that Traillour had undertaken in its January 13th offer to Chevron."

We think that the district court, by finding an unambiguous intent to confer a benefit on Chevron, misread the purpose of the side agreement between Rocky Mountain and Traillour. From the face of the agreement, there is no clear manifestation of an intent by Rocky Mountain to confer a benefit on Chevron. Instead, the side agreement indicates that the letter of credit Rocky Mountain agreed to obtain was to be "made available *for the benefit of Traillour* at the closing of the purchase of the Bayou of Couba Field."[6] It is undisputed that Traillour, at the time it entered the side agreement with Rocky Mountain, had agreed to keep in force a letter of credit in favor of Chevron; however, it is also undisputed that Chevron, in the letter accepting Traillour's offer to purchase the Bayou Couba lease, expressly conditioned the sale on Traillour and Marsh's "acquisition of a $2,000,000.00 performance bond or irrevocable letter of credit." Therefore, Rocky Mountain's agreement to obtain the initial letter of credit helped Traillour fulfill a condition precedent to Chevron's obligation to assign the Bayou Couba lease. Finally, the recital in the side agreement, on which the district court placed heavy reliance in finding an intent to benefit Chevron, simply does not reveal a clear intent to benefit Chevron. The recital, like the provisions of the side agreement itself, reveals Rocky Mountain's intent to help *Traillour* close the deal with Chevron. Any benefit derived by Chevron from this side agreement was, in our view, merely incidental.

(b) Did Rocky Mountain, in its side agreement with Traillour, make a *stipulation pour autrui* to keep in force a letter of credit in favor of Chevron?

Even if the agreement were read as clearly intending to confer a benefit to Chevron, the agreement does not reveal a clear intent to confer *continuing* benefits to Chevron. That is, under the unambiguous language of the side agreement, Rocky Mountain agreed only to provide a $2,000,000.00 standby letter of credit "at the closing of the purchase of the Bayou Couba Field."

---

[6]This intent to confer a benefit on Traillour is reinforced by the letter of credit that Rocky Mountain actually obtained for Traillour—a letter of credit issued "[b]y order of Traillour Oil Company, ... and Marsh Engineering" in favor of Chevron.

Even the recital relied upon by the district court indicates that Rocky Mountain only "agreed to provide *the* cash bid and required letter of credit...." At no point in the side agreement does Rocky Mountain agree to provide "letters of credit" or to "keep in force" a letter of credit in favor of Chevron.

Accordingly, we hold that the district court erred in concluding that Rocky Mountain agreed "to assume the same letter-of-credit obligations that Traillour had undertaken in its January 13th offer to Chevron." The obligation that Rocky Mountain assumed in the side agreement with Traillour was to provide a single letter of credit for the benefit of Traillour. In short, Rocky Mountain agreed to help Traillour close its deal with Chevron by obtaining the cash bid and a letter of credit for *Traillour* to present to Chevron at the closing. Any benefit to Chevron was incidental and was of a one-time—not a continuing—nature.

2. *The Claim Against the Investors*

The district court also granted summary judgment in favor of the investors on Chevron's claim that they were obligated to furnish replacement letters of credit. In doing so, the district court rejected Chevron's arguments that (a) the investors are obligated to provide replacement letters of credit as successors in interest to the Bayou Couba lease and (b) the investors otherwise made a *stipulation pour autrui* to provide replacement letters of credit in favor of Chevron. We address each of these arguments in turn.

(a) Are the investors obligated to provide replacement letters of credit as successors in interest?

Chevron contends on appeal that the investors, as successors in interest to Rocky Mountain or Traillour, are obligated to provide it with replacement letters of credit. The argument is as follows: Because Rocky Mountain and Traillour had promised to keep in force a letter of credit to secure the plug and abandon obligations running with the Bayou Couba lease, the investors, when they acquired their interest in the lease, became similarly obligated. For the following reasons, we reject this argument.

Initially, we note that Rocky Mountain was never obligated to keep in force a letter of credit to secure the plug and abandon obligations running with the lease. As previously discussed, *see supra*

Part III.A.1(a), Rocky Mountain did not make a *stipulation pour autrui* in favor of Chevron to keep in force a letter of credit. Rather, Rocky Mountain agreed to provide a single letter of credit for the benefit of Traillour, so that Traillour could close the deal it had made with Chevron.

Moreover, even as successors in interest to Traillour, the investors are not obligated to furnish Chevron with replacement letters of credit. Although Traillour clearly obligated itself to keep in force a letter of credit to secure the plug and abandon obligations running with the Bayou Couba lease, this obligation is simply not binding on the investors as successors in interest to Traillour. First, neither Traillour's original offer, which contains the promise to furnish letters of credit, nor Chevron's acceptance of the offer, was recorded. Under Louisiana law, therefore, Traillour's promise would not be binding as a real obligation on successors in interest to the Bayou Couba lease. *See* LA.CIV.CODE ANN. art. 1839 (West 1987); LA.REV.STAT.ANN. § 9:2721 (West 1991). Second, and more importantly, Traillour's obligation to keep in force a letter of credit is a *personal obligation,* not a real obligation that permanently attached to the Bayou Couba lease. *See* LA.CIV.CODE ANN. art. 1766. Thus, Traillour's obligation to keep in force a letter of credit in favor of Chevron, unlike a real obligation under Louisiana law, did not run with the land and automatically pass to the investors upon the transfer from Traillour. *See* LA.CIV.CODE ANN. art. 1764 (West 1989) ("A real obligation is transferred to the universal or particular successor who acquires the movable or immovable thing to which the obligation is attached, without a special provision to that effect[,] ... [b]ut a particular successor is not personally bound, unless he assumes the personal obligations of his transferor with respect to the thing."); *see also Tall Timbers Owners' Ass'n v. Merritt,* 376 So.2d 586, 588 (La.App. 4th Cir.1979) ("The jurisprudence is well settled that personal obligations must be expressly assumed.").

(b) Did the investors otherwise make a *stipulation pour autrui* to provide Chevron with replacement letters of credit?

The district court also rejected Chevron's argument that the investors independently made a *stipulation pour autrui* to provide Chevron with replacement letters of credit. The district court first noted that, because Calcasieu Marine, the issuing bank, never agreed to continue providing Chevron with letters of credit, the investors could not have assumed any such obligation of the bank to provide

such letters of credit. The district court further reasoned that paragraph 5 of LOC 554 does not itself require any of the investors to provide a letter of credit. Finally, the district court held that the continuing guaranties executed by the investors, which authorized Calcasieu Marine to extend the deadline for its letters of credit, did not (i) require Calcasieu Marine to extend the deadline or (ii) require the investors to have any subsequent letters of credit issued. Accordingly, the district court concluded that "neither the letters of credit nor the [c]ontinuing [g]uaranties display in their written terms a "manifestly clear' intent to grant a third party benefit to Chevron."

On appeal, Chevron essentially argues that the district court erred in refusing to find that the investors made a *stipulation pour autrui* to provide it with replacement letters of credit. Chevron contends that, under the law of the case doctrine, our decision in *Chevron I* requires a holding that LOC 554 obligated the investors to provide Chevron with replacement letters of credit. Chevron further maintains that, when LOC 554 is construed along with the offering memorandum prepared by Traillour and the continuing guaranties executed by the investors, it becomes clear that the investors stipulated a benefit in favor of Chevron to keep in force a letter of credit. For the following reasons, we disagree.

The "law of the case" doctrine generally precludes the reexamination of issues decided on appeal, either by the district court on remand or by the appellate court itself on a subsequent appeal. *Conway v. Chemical Leaman Tank Lines, Inc.,* 644 F.2d 1059, 1061 (5th Cir. Unit A May 1981). If an issue was decided on appeal—either expressly or by necessary implication—the determination will be binding on remand and on any subsequent appeal. *Id.* (quoting *Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 663 (5th Cir.1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975)). By contrast, if an issue was not expressly or implicitly *decided* on the prior appeal, then the law of the case doctrine is inapplicable. *See United States v. 8.41 Acres of Land,* 783 F.2d 1256, 1259 (5th Cir.), *cert. denied,* 479 U.S. 820, 107 S.Ct. 85, 93 L.Ed.2d 38 (1986).

In this appeal, the law of the case doctrine is inapplicable. In *Chevron I,* we did not expressly or implicitly decide whether the investors were obligated to furnish Chevron with replacement letters of credit. The only question we decided in *Chevron I* was whether LOC 554 was still in effect. And,

although we stated in *Chevron I* that paragraph 5 of LOC 554 "was intended to state the time frame in which the [investors] were to fulfill their underlying obligation to Chevron to either obtain a replacement LOC or pay into escrow," we made this statement only in the context of holding that paragraph 5 "was not intended to modify the expiration date" of LOC 554. Moreover, our opinion in *Chevron I* makes clear that we were not deciding whether the investors actually had an underlying obligation to furnish Chevron with a replacement letter of credit, but only observing that LOC 554 made "references" to an underlying contract between the investors and Chevron. Accordingly, we hold that our decision in *Chevron I* does not control the issue of whether the investors have an underlying obligation to furnish Chevron with replacement letters of credit.

The question we must decide, then, is whether Chevron has raised a genuine issue of material fact with regard to the existence of an underlying obligation, or a *stipulation pour autrui,* by the investors to furnish Chevron with replacement letters of credit. Pointing to (i) paragraph 5 of LOC 554 and (ii) other documents received or executed by the investors, Chevron argues that it has raised a fact issue. We do not agree.

Paragraph 5 of LOC 554, which is quoted in full *supra* Part I.C., at first glance appears to require the investors to provide Chevron with replacement letters of credit. It states that, "before termination of said Letter of Credit, [the investors] shall either furnish [Chevron] another Letter of Credit as provided herein or pay the amount of said Letter of Credit, reduced as provided herein into an escrow account." Upon closer scrutiny, however, it becomes clear that paragraph 5 of LOC 554 imposes no such obligation on the investors.

Under Louisiana law, as elsewhere, "[a] letter of credit is merely a written engagement by the issuer, usually a bank, to honor demands for payment which comply with the terms of the credit." *Cromwell v. Commerce & Energy Bank of Lafayette,* 464 So.2d 721, 728 (La.1985) (quoting Hawkland & Holland, UCC Series § 5-101:02 (Art. 5)). And, although letter of credit transactions usually involve three contracts,[7] "[t]he letter of credit [contract] is separate and distinct from the

---

[7]Letter of credit transactions usually involve distinct contracts: (1) the contract between the bank issuing the letter of credit (the issuing bank) and the person requesting that the letter of credit be issued (the customer), (2) the contract between the issuing bank and the party receiving

underlying transaction" between the party requesting issuance of the letter of credit (the customer) and the beneficiary of the letter of credit. *Cromwell,* 464 So.2d at 729. The letter of credit contract between the issuing bank and the beneficiary is not affected by the underlying contract between the beneficiary and the customer. *See* LA.REV.STAT.ANN. § 10:5-114(1) (West Supp.1993) ("An issuer [of a letter of credit] must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract between the customer and the beneficiary."). Nor, it follows, should the underlying obligation between the beneficiary and the customer be governed by the terms of letter of credit itself.

Regardless of what paragraph 5 appears to say about the investors' duty to provide a replacement letter of credit, the so-called "independence principle" applicable to letter of credit transactions argues against such an interpretation. Under settled Louisiana law, the investors' obligation to Chevron to provide replacement letters of credit is independent of the issuing bank's obligation to honor the terms of the letter of credit itself. It follows that the letter of credit obligating the issuing bank, Calcasieu Marine, to Chevron should not be read by itself to impose any obligations on the investors.

More importantly, the undisputed facts reveal that the investors never signed this letter of credit. That is, they never agreed that, before LOC 554 terminated, they would "either furnish [Chevron] another Letter of Credit ... or pay the amount of said Letter of Credit, reduced as provided herein into an escrow account." Thus, even beyond the problems raised by the "independence principle," Chevron is essentially arguing that the investors should be bound by a written agreement to which they were not a party. We decline to so bind the investors.[8]

the letter of credit (the beneficiary), which is the letter of credit itself, and (3) the underlying contract between the customer and the beneficiary. *Federal Deposit Ins. Corp. v. Plato,* 981 F.2d 852, 854 n. 3 (5th Cir.1993); *Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230, 235 (5th Cir.1983) (applying Louisiana law).

[8]Chevron attempts to avoid the "independence principle" and the fact that the investors did not sign LOC 554, arguing that "[t]he obligation of the [investors] set forth in Paragraph 5 of the letter of credit restates the obligation which the law imposed on them." Citing *Makofsky v. Cunningham,* 576 F.2d 1223 (5th Cir.1978), Chevron suggests that, under Louisiana law, the investors were required to replace LOC 554 because it expired before the underlying obligation to plug and abandon the wells was performed or breached. We disagree.

Nor can Chevron point to any other document in which the investors agreed to provide replacement letters of credit. In the offering memorandum provided the investors by Traillour, the investors were informed (i) that Traillour was obligated to keep in force a letter of credit in favor of Chevron and (ii) that they would each "be required to personally execute an agreement guaranteeing the entire amount of the $2 million letter of credit issued by the Calcasieu Marine National Bank of Lake Charles in favor of [Chevron]." The offering memorandum does not state that the investors themselves would be obligated jointly and severally, or *in solido,* to provide Chevron with an irrevocable letter of credit. Moreover, the continuing guaranties executed are not the source of any letter of credit obligations running from the investors to Chevron. The continuing guaranties merely gave Calcasieu Marine the power to extend the terms of the letters of credit issued in Chevron's favor and to make changes in the terms of the guaranty contracts themselves. They simply do not reveal any intent by the investors to provide Chevron with replacement letters of credit. Finally, Chevron does not contend that the documents transferring to the investors an interest in the Bayou Couba lease contain an obligation to provide it with a letter of credit.[9]

Accordingly, we hold that the district court correctly concluded that, on the undisputed facts

---

We recognize that, in *Makofsky,* the court held that the buyer of land, who had provided the seller with a letter of credit with a specific termination date, had the duty to extend the letter of credit. A careful reading of Judge Rubin's opinion in *Makofsky,* however, reveals that the holding in that case was compelled by the parties' *underlying agreement.* Judge Rubin specifically stated that, despite the termination date on the letter of credit itself, "it is evident that the parties [i.e., the buyer and the seller] originally intended that there would be a deposit as security for its performance." 576 F.2d at 1230. Thus, *Makofsky* is entirely consistent with the "independence principle": the court looked to the parties' underlying agreement—and not to the specific terms of the letter of credit itself—to determine whether the buyer had the duty to extend the letter of credit.

In this case, by contrast, there is simply no evidence of an underlying agreement between Chevron and the investors obligating the investors to provide Chevron with replacement letters of credit. Chevron's reliance on *Makofsky* is misplaced.

[9]We note that in the documents by which the investors received their interests in the Bayou Couba lease, the investors agreed to "assume all obligations and perform all duties *resulting from the ownership of the Subject Interest* conveyed hereby or imposed by any governmental authority asserting jurisdiction over the lands covered by the Lease." The duties and the obligations assumed by the investors, however, plainly do not include Traillour's personal obligation to keep in force letters of credit, because such an obligation does not "result" from ownership of the Bayou Couba leasehold. *See supra* Part III.A.2(a).

of this case, the investors have made no *stipulation pour autrui* in favor of Chevron to provide replacement letters of credit. None of the documents that Chevron points to reveals any intent by the investors, much less a manifestly clear intent, to confer a benefit on Chevron. All that Chevron can point to is the fact that the investors guaranteed LOC 465 and later ordered that LOC 465 be replaced with LOC 554. This evidence, standing alone, is insufficient to raise a genuine issue of material fact with regard to the existence of an underlying agreement *clearly manifesting* an intent by the investors to provide replacement letters of credit for the benefit of Chevron.[10]

B. The Underlying Plug and Abandon Indemnity Claims

On cross-appeal, Rocky Mountain and the investors argue that the district court erred in granting summary judgment in favor of Chevron with respect to Chevron's underlying plug and abandon indemnity claims. They argue that Chevron is not entitled to a declaratory judgment that Rocky Mountain and the investors "owe Chevron indemnity *in solido* for the entirety of any [plug and abandon] obligations on the [Bayou Couba] lease." While we agree with the investors that they do not owe Chevron indemnity for the entirety of any plug and abandon obligations, we disagree with Rocky Mountain that it owes no such indemnity to Chevron.

1. *Jurisdictional Issues*

Initially, we address several jurisdictional arguments raised by the parties. In particular, we address arguments that (a) Chevron's plug and abandon indemnity claims are moot, (b) Chevron's plug and abandon indemnity claims are not ripe for judicial review, and (c) the district court should

---

[10]Under Louisiana law, "[m]ost of the decisions on stipulations pour autrui indicate that to be enforceable, the contract between the parties must not only make clear and manifest their intent to confer a benefit on a third person, but also must be in writing." *Homer Nat'l Bank v. Tri-District Dev. Corp.,* 534 So.2d 154, 156-57 (La.App. 3d Cir.1988), *writ denied,* 536 So.2d 1236 (La.1989); *see also Fontenot v. Marquette Cas. Co.,* 258 La. 671, 247 So.2d 572, 579 (1971) ("In Louisiana contracts for the benefit of others ... must be in writing and clearly express that intent."). And, although the "writing requirement" has been questioned by one Louisiana intermediate appellate court, *see Wall v. First Nat'l Bank of Shreveport,* 482 So.2d 865 (La.App. 2d Cir.1986), this court has indicated that either "an express declaration or an extremely strong implication" is required to establish a *stipulation pour autrui* under Louisiana law. *See New Orleans Public Serv., Inc. v. United Gas Pipe Line Co.,* 732 F.2d 452, 467-68 (5th Cir.), *cert. denied sub nom. Morial v. United Gas Pipe Line Co.,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984). With respect to the investors' alleged *stipulation* to provide Chevron with replacement letters of credit, Chevron has simply failed to raise a fact issue with regard to this requirement.

have abstained from ruling on Chevron's plug and abandon indemnity claims. For the following reasons, we reject each of the jurisdictional arguments and hold that the district court correctly reached the merits of Chevron's claims.

(a) Are Chevron's plug and abandon indemnity claims moot?

Two of the investors, Tellurogenic, Inc. ("Tellurogenic") and Spencer Oil Company ("Spencer Oil"), raise a mootness argument. They point to the 1990 amendment to section 30:4.C(1) of Louisiana's Revised Statutes, which states that only an "owner"—i.e., "the person who has the right to drill into and produce from a pool and to appropriate the production either for himself or for others"—may be held liable by the Louisiana Conservation Commissioner for plugging and abandoning wells on an oil and gas lease. They argue that this amendment has rendered moot any case or controversy respecting the parties' liability for plugging and abandoning wells on the Bayou Couba lease.

A controversy becomes moot where, as a result of intervening circumstances, there are no longer adverse parties with sufficient legal interests to maintain the litigation. *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1859). Mootness can arise in one of two ways: First, a controversy can become moot "when the issues presented are no longer "live.' " *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). A controversy can also become moot when "the parties lack a legally cognizable interest in the outcome." *Id.*

There are two problems with the mootness argument advanced by Tellurogenic and Spencer Oil. One is that it ignores the express promise made by Chevron's predecessor Gulf, in its original lease with Delta Securities Company, to "plug and abandon all wells on the released and surrendered acreage in accordance with the rules and regulations of any governmental agency, official or department having jurisdiction." Under section 129 of the Louisiana Mineral Code, "[a]n assignor ... is not relieved of his obligations or liabilities under a mineral lease unless the lessor has discharged him expressly and in writing." LA.REV.STAT.ANN. § 31:129 (West 1989); *see also Kleas v. Mayfield,* 404 So.2d 500, 506 (La.App. 3d Cir.1981). The 1990 amendment to section 30:4.C(1) of the Louisiana Revised Statutes does not, therefore, affect Chevron's obligation under the original

lease with Delta Securities to plug and abandon the wells. The second problem with the argument is that it ignores the possibility that Chevron might be held liable for plugging and abandoning the wells as a prior owner of the Bayou Couba lease. That is, nothing in the language of 1990 amendment prohibits the Louisiana Conservation Commissioner from interpreting the word "owner" broadly and proceeding against a prior owner of the Bayou Couba lease. *See* Memorandum from the Louisiana Comm'r of Conservation re: Enforcement Policy—Abandoned Wells and Pits (July 24, 1990). Because there is still a substantial possibility that Chevron will be held liable for plugging and abandoning the wells on the Bayou Couba lease, we hold that the 1990 amendment does not moot Chevron's claim for a declaratory judgment that Rocky Mountain and the investors are liable to indemnify Chevron for any subsequently incurred plug and abandon obligations.

(b) Are Chevron's plug and abandon indemnity claims ripe?

At oral argument, Rocky Mountain also suggested that Chevron's plug and abandon indemnity claims are not ripe for adjudication. Rocky Mountain's argument in this regard is related to the mootness argument raised by Tellurogenic and Spencer Oil. Specifically, Rocky Mountain contends that, because no one has yet threatened to require Chevron to plug and abandon the wells on the Bayou Couba lease, their request for a declaratory judgment is not yet ripe for review.

In *New Orleans Public Service, Inc. v. Council of New Orleans,* 833 F.2d 583 (5th Cir.1987), this court set forth the prevailing standards for determining whether a dispute is ripe. We stated:

> A court should dismiss a case for lack of "ripeness" when the case is abstract or hypothetical. The key considerations are "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required.

*Id.* at 586-87 (citations omitted). Thus, the ripeness inquiry focuses on whether an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention. *See* 13A C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3531.12, at 50 (1984).

We hold that Chevron's plug and abandon indemnity claims, which present an actual controversy as to the obligations of successive holders of the Bayou Couba lease to Chevron, are ripe for adjudication. As already discussed, there is a substantial possibility that Chevron will be required

to plug and abandon the wells on the Bayou Couba lease. Moreover, the only remaining question is a legal one—namely, whether Rocky Mountain and the investors are liable, as transferees of interests in the Bayou Couba lease, to indemnify Chevron for any subsequently incurred plug and abandon obligations. Finally, judicial resolution of Chevron's plug and abandon indemnity claims at this time is consistent with the purpose of Declaratory Judgment Act itself. *See Hardware Mut. Cas. Co. v. Schantz,* 178 F.2d 779, 780 (5t h Cir.1949) ("The purpose of the Declaratory Judgment Act is to settle "actual controversies' before they ripen into violations of law or breach of some contractual duty.").

(c) Should the district court have abstained from ruling on Chevron's plug and abandon indemnity claims?

Tellurogenic and Spencer Oil also argue that, under *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), the district court should have abstained from determining who is liable to plug and abandon Louisiana oil wells.[11] They argue specifically, citing *Magnolia Coal Terminal v. Phillips Oil Co.,* 561 So.2d 732 (La.App. 4th Cir.1990), *aff'd in part and rev'd in part,* 576 So.2d 475 (La.1991), that only the Louisiana Commissioner of Conservation can make and enforce plug and abandon rules and regulations. They further reason that, because the district court decided matters within the Louisiana Commissioner's jurisdiction, there is the possibility of conflicting results and standards between the Louisiana Commissioner and the federal courts on the issue of who is obligated to plug and abandon the wells on the Bayou Couba lease.

Tellurogenic and Spencer Oil misconstrue the nature of the district court's ruling. The district court did not order Rocky Mountain and the investors to plug and abandon the wells on the Bayou Couba lease, nor did it determine who is ultimately obligated to plug and abandon the wells under Louisiana law. Rather, the district court held only that, if Chevron is required to expend money to plug and abandon the wells on the Bayou Couba lease, Rocky Mountain and the investors must

---

[11]It does not appear that Tellurogenic and Spencer Oil raised their *Burford* abstention argument, which is not strictly jurisdictional, in district court. We have held, however, that "[w]here *Burford*-type abstention is appropriate, ... it can be ordered on appeal even if not raised in the trial court." *Martin Ins. Agency, Inc. v. Prudential Reinsurance Co.,* 910 F.2d 249, 255 (5th Cir.1990).

indemnify Chevron. Contrary to the assertion by Tellurogenic and Spencer Oil, then, the district court did not exercise jurisdiction or render a judgment in a manner that potentially conflicts with the authority of the Commissioner of Conservation. Therefore, the district court was not required to abstain under *Burford.*

2. *The Claim Against Rocky Mountain*

On cross-appeal, Rocky Mountain does not dispute that, under the terms of the original assignment of the Bayou Couba lease, it expressly agreed to be responsible for all costs associated with plugging and abandoning the wells on the lease. Indeed, it is undisputed that, under the terms of the original assignment, Rocky Mountain agreed

> to promptly plug and abandon all the wells described in Exhibit B as well as any wells drilled by Traillour et al under the terms of the lease identified in Exhibit A, including the saltwater disposal wells, upon termination of operations on the lease acreage in a good, workmanlike manner and in accordance with said lease and the rules and regulations of the Louisiana Commissioner of Conservation.

The assignment further provides that "[t]he entire costs, expense and risk of plugging and abandoning the above-described wells, cleanup operations and any other operations provided for under the aforesaid lease, shall be borne by Traillour et al."

Rocky Mountain nonetheless contends that the district court erred in granting summary judgment in favor of Chevron on Chevron's plug and abandon indemnity claim. Rocky Mountain first argues that the district court abused its discretion in ruling on Chevron's plug and abandon indemnity claim, given that Chevron did not raise the claim until it filed its motion for summary judgment. Alternatively, Rocky Mountain argues that it raised a genuine issue of material fact with regard to whether Chevron is estopped from enforcing the expressly assumed plug and abandon obligations. As discussed below, neither of these arguments has merit.

(a) Did the district court abuse its discretion in denying Rocky Mountain's motion for a continuance and ruling on Chevron's plug and abandon indemnity claim against Rocky Mountain?

It is undisputed that Chevron raised its plug and abandon indemnity claims belatedly. When Chevron filed its motion for summary judgment raising the plug and abandon indemnity claims, those claims had not been raised in Chevron's complaint. Moreover, Rocky Mountain had not been afforded the opportunity to assert any defenses to the claims. Nor had Rocky Mountain had any

opportunity to conduct any discovery with respect to the claims.

In response to Chevron's motion for summary judgment, Rocky Mountain filed a motion to continue the hearing on the plug and abandon indemnity claims. At a status conference held prior to the summary judgment hearing, the district court allegedly indicated[12] that it would sever the plug and abandon indemnity claims and refrain from deciding the issue until (i) Chevron had filed an amended complaint formally raising the issue in the litigation, (ii) Rocky Mountain and the investors had been given the opportunity to conduct discovery with respect to, and assert defenses to, the claims, and (iii) after the court had ruled on the letter of credit issues. Notwithstanding its alleged representations at the status conference, the district court ruled on Chevron's plug and abandon indemnity claims at the same time it ruled on the letter of credit claims—despite the fact that Rocky Mountain had not conducted any discovery on the claim.[13]

Rocky Mountain argues that the district court erred in denying Rocky Mountain's motion for a continuance under Federal Rule of Civil Procedure 56(f) and ruling on Chevron's plug and abandon indemnity claims. In its brief on cross-appeal, Rocky Mountain asserts that "[t]he effect of the [d]istrict [c]ourt's action was to deny Rocky Mountain the ability to properly defend Chevron's contentions as to the plugging and abandonment issue, and prevent Rocky Mountain from conducting any discovery or investigation therein." The district court's action, according to Rocky Mountain, was "fundamentally unfair."

Rule 56(f) of the Federal Rules of Civil Procedure gives district courts discretion to grant motions to continue in the context of summary judgment proceedings. It provides that, under appropriate circumstances, the district court may "refuse the application for [summary] judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." FED.R.CIV.P. 56(f). In order to obtain a

---

[12]We note that there is no transcript of this status hearing in the record on appeal.

[13]After the status conference, Chevron did formally amend its complaint to request a declaratory judgment with respect to its plug and abandon indemnity claims. Moreover, in its response to Chevron's motion for summary judgment, Rocky Mountain asserted the defenses of waiver and estoppel with respect to the plug and abandon indemnity claim against it.

continuance for discovery, the non-movant must (i) request extended discovery prior to the district court's ruling on summary judgment, (ii) put the district court on notice that further discovery pertaining to the summary judgment motion is being sought, (iii) demonstrate to the district court specifically how the requested discovery pertains to the pending motion, and (iv) diligently pursue relevant discovery. *Wichita Falls Office Assocs. v. Banc One Corp.,* 978 F.2d 915, 919 (5th Cir.1992) (citing *International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1267-68 (5th Cir.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992)). The grant or denial of a continuance pursuant to Rule 56(f) will be disturbed on appeal only if the district court abused its discretion. *Cormier v. Pennzoil Exploration & Prod. Co.,* 969 F.2d 1559, 1561 (5th Cir.1992) (citing *Paul Kadair, Inc. v. Sony Corp. of Am.,* 694 F.2d 1017, 1029-30 (5th Cir.1983)).

We cannot say that the district court abused its discretion in denying Rocky Mountain's motion for a continuance and ruling on Chevron's plug and abandon indemnity claim. As the district court noted, Rocky Mountain never asserted what additional discovery would be needed. *See Securities & Exchange Comm'n v. Spence & Green Chem. Co.,* 612 F.2d 896, 901 (5th Cir.1980) (nonmovant requesting a continuance may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts), *cert. denied,* 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981). Nor did Rocky Mountain diligently pursue any relevant discovery. During the one-and-a-half-month period between the time that Chevron filed its motion for summary judgment and the time the district court took the motion under submission, Rocky Mountain never sought leave to lift the discovery stay in any respect. Accordingly, we hold that the district court was well within its discretion in denying Rocky Mountain's motion for a continuance.

(b) Has Rocky Mountain raised a genuine issue of material fact with regard to its estoppel defense?

Rocky Mountain further contends that it raised a genuine issue of material fact with regard to whether Chevron is estopped from asserting its plug and abandon indemnity claim against Rocky Mountain. Pointing to Chevron's release of the letter of credit originally obtained by Rocky Mountain for the benefit of Traillour, as well as Chevron's subsequent failure to require the investors to keep in force a letter of credit, Rocky Mountain argues that "Chevron should be equitably estopped from

seeking to enforce its plugging and abandonment rights against Rocky Mountain." We disagree and hold that the district court correctly granted summary judgment in favor of Chevron on Chevron's plug and abandon indemnity claim against Rocky Mountain.

The law of equitable estoppel in Louisiana is one of last resort, to be applied only when the ends of justice so demand. *See Howard Trucking Co. v. Stassi,* 485 So.2d 915, 918 (La.), *cert. denied,* 479 U.S. 948, 107 S.Ct. 432, 93 L.Ed.2d 382 (1986). "The doctrine is founded upon good faith and is designed to prevent injustice by barring a party, from taking a position contrary to his prior acts, admissions, representations, or silence." *Dizell v. Durr,* 519 So.2d 863, 866 (La.App. 4th Cir.1988). For equitable estoppel to apply, three elements must be present: (1) a representation by conduct or word; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of that reliance. *Howard Trucking,* 485 So.2d at 918.

Thus, to successfully withstand Chevron's motion for summary judgment with respect to the plug and abandon claim, Rocky Mountain was required to raise a genuine issue of material fact with regard to each of the elements of equitable estoppel. That is, Rocky Mountain must have come forward with summary judgment evidence sufficient to raise a fact issue concerning: (1) whether Chevron made a representation by conduct or word concerning Rocky Mountain's plug and abandon obligations; (2) whether Rocky Mountain justifiably relied on Chevron's representation; and (3) whether Rocky Mountain detrimentally changed its position because of that reliance. *See Howard Trucking,* 485 So.2d at 918.

In our view, Rocky Mountain has failed to raise a genuine issue of material fact on the first element of equitable estoppel under Louisiana law. Specifically, Rocky Mountain has not pointed to any representation made by Chevron concerning the plug and abandon obligations expressly assumed by Rocky Mountain. Although Rocky Mountain hints that Chevron made such a representation by releasing the original letter of credit procured by Rocky Mountain, we fail to see how Chevron's conduct in releasing the letter of credit, which is independent of the underlying obligation to plug and abandon, *see supra* Part III.A.2(b), could constitute a representation that Chevron was also releasing Rocky Mountain of its underlying plug and abandon obligations. Therefore, the district court

correctly awarded Chevron summary judgment on its plug and abandon indemnity claim against Rocky Mountain.

3. *The Claim Against the Investors*

The investors also challenge the district court's award of summary judgment in favor of Chevron on the plug and abandon indemnity claims. They argue that (a) as sublessees of Traillour, they are not obligated *to Chevron* to plug and abandon the wells on the Bayou Couba lease or to indemnify Chevron for any plugging and abandoning, (b) even if they are required to indemnify Chevron for plug and abandon obligations, they are only required to pay their proportionate share of plug and abandon costs, and (c) they raised a genuine issue of material fact with regard to their right to rescind the subleases from Traillour on grounds of fraud or error. Because we find the investors' first argument meritorious, we do not address the investors' other arguments.

In its memorandum ruling, the district court stated: "[The investors] concede that, if their assignments [from Traillour] are valid, then each owes Chevron indemnity for any [plug and abandon] obligations to the extent of that person's working interest in the lease." The district court apparently relied on a statement made by the investors in their memorandum in opposition to Chevron's motion for summary judgment. That memorandum stated: "[N]one of the investors have denied that they have an obligation to pay their proportionate share of the costs of plugging and abandoning the wells in proportion to their ownership interest in the lease."

On cross-appeal, the investors argue that they never conceded owing any plug and abandon obligations *to Chevron.* Rather, they argue that, "[a]s sublessees of Traillour Oil Company, the individual investors owe no obligation to Chevron[,] who assigned all of its right, title and interest in the Bayou Couba lease to Traillour Oil." They do concede, however, that if the subleases from Traillour are valid, they are obligated *to Traillour* to bear their share of the costs to plug and abandon the wells.

(a) Have the investors waived the argument that they owe no plug and abandon obligations *to Chevron?*

Initially, we address Chevron's contention that the investors have waived the argument that, as sublessees of Traillour, they owe no plug and abandon obligations *to Chevron,* a once-removed

assignor of the Bayou Couba lease. Chevron maintains that the investors are essentially arguing that Chevron is not the "real party in interest" to prosecute the suit. According to Chevron, because the investors did not raise this defense below, they have waived it.

We conclude that the investors did not waive the argument that they owe no plug and abandon obligations to Chevron. Throughout the litigation, the investors have maintained that they have no contractual obligations to Chevron. Moreover, in their memorandum in opposition to Chevron's motion for summary judgment, the investors argued that there was no code-imposed privity of contract between Chevron and the investors. Chevron's waiver argument is without merit.

(b) Do the investors owe any plug and abandon obligations *to Chevron*?

Chevron nonetheless maintains that the investors' argument in this regard must fail. Pointing to section 128 of the Louisiana Mineral Code, Chevron contends that it can enforce Traillour's plug and abandon obligations—obligations that clearly run in favor of Chevron—against the investors as sublessees once-removed. Chevron further argues that, even in the absence of section 128 of the Louisiana Mineral Code, the investors are liable to indemnify Chevron for plugging and abandoning the wells on the Bayou Couba lease.

Section 128 of the Louisiana Mineral Code provides that, "[t]o the extent of the interest acquired, an assignee or sublessee acquires the rights and powers of the lessee and becomes responsible *directly to the original lessor* for performance of the lessee's obligations." LA.REV.STAT.ANN. § 31:128 (West 1989) (emphasis added). This provision, according to a Louisiana oil and gas commentator, represented a dramatic departure from prior case law. John M. McCollam, *A Primer for the Practice of Mineral Law Under the New Louisiana Mineral Code,* 50 TUL.L.REV. 729, 831 (1976). It effectively overruled the major premise of the Louisiana Supreme Court's decision in *Broussard v. Hassie Hunt Trust,* 231 La. 474, 91 So.2d 762 (1956)—that an initial lessor could not sue a sublessee to enforce obligations of the original lease because there was no privity of contract or estate between the two parties.[14] Under the plain language of section 128,

---

[14]The rule was otherwise with respect to assignments. An original lessor could sue an assignee of the original lessee, because the assignee was deemed to be in privity of estate with the original lessor. *See Broussard,* 91 So.2d at 765.

then, the original lessor can directly sue both a remote sublessee and a remote assignee to enforce the obligations of the original lease. McCollam, *supra,* at 831.

In *Robinson v. North American Royalties, Inc.,* 463 So.2d 1384 (La.App. 3d Cir.), *judgment amended,* 470 S.2d 112 (La.1985), the Louisiana court interpreted the term "original lessor" in section 128 broadly. It held that section 128 allows a lessee-sublessor to enforce obligations created in its sublease against a sublessee once-removed. The *Robinson* court reasoned:

> We interpret [section] 128 as the Legislature's creation of a code imposed privity of contract between a lessor and a sublessee in the mineral rights area.... Logic therefore dictates that if there is privity of contract between a lessor and a sublessee, there exists privity of contract between a lessee-sublessor and a sublessee once removed.

*Id.* at 1388.

Assuming that *Robinson* represents a correct statement of Louisiana law, it does not aid Chevron. Chevron is not a lessee-*sublessor,* but a lessee-*assignor.*[15] And, as Chevron conceded at oral argument, section 128 does not run in favor of assignors. Thus, while section 128 may impose privity between a lessor and a remote assignee or sublessee, we are not prepared to say—as a federal court sitting in diversity—that it creates statutory privity between all successors in interest to an oil and gas lease. *Cf.* McCollum, *supra,* at 829 (observing that, although distinction between an assignment and a sublease is less significant under the Louisiana Mineral Code, it is still of continuing importance).

Chevron nonetheless argues that, under the terms of their subleases with Traillour, the investors must indemnify Chevron for plugging and abandoning the wells on the Bayou Couba lease. Pointing to several provisions of those subleases, Chevron argues that the investors expressly assumed Traillour's obligations under the original assignment from Gulf and made a *stipulation pour*

---

[15]Although Chevron has contended for the first time on appeal that its transfer to Traillour, Rocky Mountain, and Marsh constituted a sublease, the plain language of the transfer instrument indicates that it was an assignment. In the transfer instrument, Chevron's predecessor Gulf transferred "all of [its] right, title, and interest in and to" the Bayou Couba lease. Gulf did not retain any interest in or control over the leased premises, for example, by (i) retaining the right to restrict further transfer of the lease, *see Bordelon v. Bordelon,* 434 So.2d 633 (La.App.3d Cir.1983), or (ii) retaining an overriding royalty, *see Bond v. Midstates Oil Corp.,* 219 La. 415, 53 So.2d 149 (1951). Under well established Louisiana law, the transfer from Gulf to Traillour, Rocky Mountain, and Marsh was an assignment and not a sublease. *See Tomlinson v. Thurmon,* 189 La. 959, 181 So. 458, 459 (1938).

*autrui* in favor of Chevron to be responsible for the costs of plugging and abandoning the wells. Thus, Chevron contends that it need not rely on section 128 of the Louisiana Mineral Code in order to be entitled to indemnity from the investors.

In support of its argument, Chevron primarily relies on two paragraphs in the investors' subleases. First, Chevron points to the provision in which each of the investors agreed to "assume all obligations and perform all duties resulting from the ownership of the Subject Interest conveyed hereby or imposed by any governmental authority asserting jurisdiction over the lands covered by the lease." Chevron also relies on the provision in which each investor (i) agreed to "comply with all of the express and implied covenants and conditions of [the Bayou Couba lease]" and (ii) obligated himself "to comply and conduct his operations hereunder in accordance with all rules and regulations of the Commissioner of Conservation."

Article 1821 of the Louisiana Civil Code provides that "[a]n obligor and a third person may agree to an assumption by the latter of an obligation of the former." LA.CIV.CODE ANN. art. 1821 (West 1987). The article further provides that such an assumption, "[t]o be enforceable by the obligee against the third person, ... must be in writing." Because the subleases between Traillour and the investors are in writing, we are only concerned with whether the third parties in this case—i.e., the investors—assumed the obligations running from Traillour to Chevron.

We reject Chevron's argument that, by the provisions quoted above, the investors "assumed ... the obligations which Traillour had undertaken in its contract with Gulf." Neither of the provisions mentions "Traillour's obligations to Chevron," and neither of the provisions refers to the assignment from Gulf to Traillour. By assuming "all obligations" resulting from their ownership of the conveyed interests in the Bayou Couba lease, the investors were personally assuming only the real obligations running with the Bayou Couba lease, obligations running in favor of the original lessor. The investors similarly obligated themselves to the original lessor by agreeing to "comply with all of the express and implied covenants and conditions of [the Bayou Couba lease]," as well as the rules and regulations of the Louisiana Commissioner of Conservation. We decline to read into the investors' subleases an express assumption of Traillour's personal obligations to Chevron, where no such assumption is

apparent from the face of the documents.[16]

We likewise reject Chevron's related contention that the above quoted provisions constitute a *stipulation pour autrui* in favor of Chevron.  As already noted, *see supra* Part III.A.1(a), a *stipulation pour autrui* will be found only when the contract *clearly* contemplates a benefit to a third person as its condition or consideration.  The provisions in the subleases between Traillour and the investors simply do not clearly contemplate a benefit to Chevron.  Rather, any benefit to Chevron would simply be incidental.

Chevron also points to the sublease provision in which each investor agreed "to bear his proportionate cost, expense and risk of plugging and abandoning the [wells on the Bayou Couba lease]...."  Chevron suggests that this provision represents a partial assumption of Traillour's obligations to Chevron, as well as a partial *stipulation pour autrui* in favor of Chevron.  Again, we must disagree.  There is no indication that the investors, by agreeing *with Traillour* to be responsible for their proportional share of the costs of plugging and abandoning the wells on the Bayou Couba lease, intended to partially assume Traillour's obligations to Chevron.  Nor is there any clear intent that, by this promise, the investors meant to confer a benefit on Chevron.  Rather, from the face of this provision, it is clear that Traillour and the investors were agreeing, as among themselves, to share the costs of plugging and abandoning the wells on the Bayou Couba lease.

Accordingly, we hold that the district court erred in concluding that the investors are obligated to indemnify Chevron for any subsequently incurred plug and abandon obligations.  While undoubtedly the investors are obligated to plug and abandon the wells on the Bayou Couba lease, their obligation runs only to (i) the original lessor, under section 128 of the Louisiana Mineral Code,

---

[16]The provisions in the investors' subleases that Chevron points to as constituting an assumption of Traillour's obligations may be contrasted with the assumption provision in the original assignment from Chevron to Traillour, Rocky Mountain, and Marsh.  The original assignment provided as follows:

> Traillour et al shall comply with all of the express and implied covenants and conditions of the lease described in Exhibit "A" *and shall assume all of Gulf's obligations under said lease.*

In the subleases from Traillour to the investors, by contrast, there is no such assumption provision.

(ii) Traillour, under the terms of their subleases, and (iii) the Louisiana Commissioner of Conservation, under section 30:4.C(1)(a)(iv) of the Louisiana Revised Statutes. The investors are not obligated to Chevron to plug and abandon the wells. Therefore, they are not obligated to indemnify Chevron for any subsequently incurred plug and abandon obligations.[17]

## IV. CONCLUSION

The district court correctly granted summary judgment in favor of Rocky Mountain and the investors on Chevron's letter of credit claims. The district court also correctly granted summary judgment in favor of Chevron on Chevron's plug and abandon indemnity claim against Rocky Mountain. We therefore AFFIRM the district court's decision as to these claims.

The district court erred, however, in granting summary judgment in favor of Chevron on Chevron's plug and abandon indemnity claim against the investors, because the investors do not owe any plug and abandon obligations to Chevron. We therefore REVERSE this part of the district court's decision and instruct the district court to dismiss with prejudice Chevron's plug and abandon indemnity claim against the investors. Each party shall bear its own costs.

---

[17]We note that we have only been asked to decide whether the investors must *indemnify* Chevron for any subsequently incurred plug and abandon obligations. No party has raised the question of whether Chevron—in the event that it is held liable *in solido* with Traillour, Rocky Mountain, and the investors for plugging and abandoning the wells on the Bayou Couba lease—would have a right of contribution against the investors for a portion of the costs to plug and abandon the wells. We therefore do not address whether Chevron would have a right of contribution against the investors under such circumstances.