**DAVIS OIL COMPANY**

v.

**TS, INC.**

**Civil Action No. 93–587.**

United States District Court,
E.D. Louisiana.

Jan. 21, 1997.

---

**21.** *McGee,* 93 F.3d at 385 n. 9.

**22.** *McGee,* 93 F.3d at 385 n. 9.

Felix Henri Lapeyre, Jr., Matthew J. Randazzo, III, Lapeyre, Terrell & Randazzo, New Orleans, LA, for Davis Oil Co.

Blake G. Arata, Marcy V. Massengale, Gordon, Arata, McCollam & Duplantis, LLP, New Orleans, LA, William B. Monk, William E. Shaddock, Stockwell, Sievert, Viccellio, Clements & Shaddock, LLP, Lake Charles, LA, for TS, Inc.

John Y. Pearce, Brett A. North, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, Alan H. Katz, En-

tergy Services, Inc., New Orleans, LA, for Presidio Exploration, Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

FALLON, District Judge.

Pursuant to stipulation, in lieu of presenting live witnesses at trial, the parties have submitted the above-entitled action to the Court via joint stipulations, stipulated exhibits, and trial memoranda. This court, having heard the matter on this basis, now makes the following findings.[1]

### I. FINDINGS OF FACT:

Plaintiff, Davis Oil Company ("Davis Oil") brings this action seeking, among other things, judgment in its favor declaring that defendant, TS, Inc., has assumed the obligations of Lessee under that certain Oil, Gas and Mineral Lease, dated August 16, 1976, granted by the State of Louisiana (the "State") through the State Mineral Board to Davis Oil, covering certain property located offshore Louisiana in Block 26, West Delta Area, Plaquemines Parish ("State Lease 7027" or the "Lease" or the "Lease Agreement"). In particular, plaintiff asserts that defendant has assumed the obligation to plug and abandon all wells on the leased premises, to remove all structures and facilities serving the wells, and to retrieve and properly dispose of surface contamination.

#### A. History of State Lease 7027:

On August 16, 1976, the State, by and through the Mineral Board, as "Lessor," granted State Lease 7027 in favor of Davis Oil, as "Lessee."[2] On October 18, 1976, Davis Oil assigned 7.5% of its interest in the Lease to ENI Oil & Gas Drilling Program 1976-A ("ENI"), which assignment was approved by the State Mineral Board.[3] On January 1, 1981, Davis Oil entered into an agreement of sale and purchase (the "Purchase Agreement"),[4] whereby Davis Oil assigned to HPC, Inc. ("HPC") all of its rights in certain assets, including all of Davis Oil's remaining interest (92.5%) in the Lease.[5] As assignee, HPC expressly assumed the obligations of lessee under the Lease.[6] The State Mineral Board approved this assignment by resolution dated April 8, 1981.[7] On June 16, 1981, the Louisiana Department of Conservation authorized the change of operator from Davis Oil to HPC's subsidiary, Home Petroleum Corporation ("Home Petroleum").[8]

On December 1, 1982, Home Petroleum and ENI assigned to Davis Fuel Inc. ("Davis Fuel")[9] all of their right, title, and interest in and to the Lease, which assignment was approved by resolution of the State Mineral Board.[10] On April 25, 1983, the Department of Conservation authorized the change of operator from Home Petroleum to Davis Fuel.[11]

On October 18, 1983, Davis Fuel assigned all of its right, title, and interest in and to the Lease to Spartan Minerals, Inc. ("Spartan"), which assignment was approved by resolution of the State Mineral Board.[12] On November 8, 1983, the Department of Conservation authorized the change of operator from Davis Fuel to Spartan.[13] Also in 1983, Spar-

---

1. To the extent that any findings of fact presented herein are determined to be conclusions of law, they are adopted as such, and to the extent that any conclusions of law presented herein are determined to be findings of fact, they are adopted as such.

2. See Joint Trial Stipulations at ¶ 5.

3. See Exhibit 16a. Under Louisiana law, "[n]o transfer or assignment in relation to any lease of minerals or mineral rights owned by the state [is] valid unless approved by the State Mineral Board." See La.Rev.Stat.Ann. § 30:128 (West 1989 & 1996 Supp.).

4. See Exhibit 2.

5. See Joint Trial Stipulations at ¶¶ 8 and 9; see also Exhibits 2 and 3.

6. See Exhibit 3 at 5.

7. See Joint Trial Stipulations at ¶ 10.

8. See Exhibit 17a.

9. The parties agree that Davis Fuel is in no way affiliated with Davis Oil.

10. See Exhibit 16c.

11. See Exhibit 17b.

12. See Exhibit 16d.

13. See Exhibit 17c.

tan assigned certain of its interests in the Lease to 1) Davis Fuel (a Louisiana partnership), 2) Great Central Texas Oil & Gas, Inc., 3) Spartan Minerals West–Delta, Inc., and 4) Davis Fuel, Inc. ("Davis Fuel"), which assignments were each approved by the State Mineral Board.[14]

In June 1985, production of oil and gas from the Lease ceased, and the Lease expired according to its own terms in September 1985 for failure to conduct operations or produce oil, gas, or other minerals on the leased property or lands pooled or unitized therewith.[15] The owners of the Lease at the time of its termination did not plug and abandon the wells on the leased premises or remove the structures and facilities serving the wells as required under the Lease.[16]

### B. The 1988 Asset Sale:

HPC, to whom Davis Oil assigned the remainder of its interests in the Lease in 1981, was an indirect subsidiary of Hiram Walker–Gooderham & Worts Limited ("HW–GW"),[17] a Canadian liquor company, which was an indirect subsidiary of Hiram Walker Resources Ltd. ("HWR").[18] On March 31, 1986, HWR and two of its affiliates entered into a Share Purchase Agreement with Allied–Lyons PLC ("Allied–Lyons"), arranging for Allied–Lyons to purchase all of the issued and outstanding stock in HW–GW.[19] This agreement provided that the "natural re-

source assets" of HPC were to be sold prior to the closing of the share purchase transaction.[20] Subsequent to the March 31, 1986 agreement, however, it appears that Gulf Canada Corporation, later known as Gulf Canada Resources Limited, ("Gulf Canada") acquired control of HWR, and certain aspects of the agreement were renegotiated, including the provision dealing with the natural resource assets of HPC.[21]

On September 5, 1986, the parties entered into a Supplemental Share Purchase Agreement.[22] Under the terms of this new agreement, if the "Oil and Gas Assets and Liabilities"[23] were not sold prior to the closing of the share purchase transaction, then Gulf Canada would enter into an agreement with HPC prior to the closing, granting HPC the option to sell the "Oil and Gas Assets and Liabilities" to Gulf Canada or to a subsidiary or designee of Gulf Canada. The option would be exercisable for a period of 24 months at HPC's sole discretion.

The "Oil and Gas Assets and Liabilities" were not sold prior to closing of the share purchase transaction, and, on December 9, 1986, the Oil and Gas Sale Option Agreement (the "Option Agreement") was entered into among Gulf Canada, HPC, Allied–Lyons, and 678756 Ontario Inc., the subsidiary of Allied–

---

14. The assignments to Davis Fuel (a Louisiana partnership) and Davis Fuel, Inc. were made on October 18, 1983 and approved by the State Mineral Board on January 11, 1984. *See* Exhibits 16e and 16h. The assignments to Great Central Texas Oil & Gas, Inc. and Spartan Minerals West–Delta, Inc. were made on December 12, 1983 and approved by the State Mineral Board on February 8, 1984. *See* Exhibits 16f and 16g.

15. *See* Joint Trial Stipulations at ¶ 12.

16. *See* Joint Trial Stipulations at ¶ 13; *see also* Exhibit 1 at ¶ 12.

17. *See* Exhibit 12.

18. Although the precise relationship is less than clear from the record, it appears that HWR owned and/or controlled both Home Oil Company Limited and Walker–Home Oil Limited. *See* Exhibit 5, schedule A. In March 1986, these two corporations jointly owned HW–GW. *See* Exhibit 12; *see also* Exhibit 8.

19. *See* Exhibit 12.

20. *See* Exhibit 12 at § 2.01.

21. The record does not reveal on what date or by what manner Gulf Canada came to acquire control of HWR, but it is clear that Gulf was the controlling shareholder of HWR by September 1986. *See* Exhibit 13 at 6.

22. *See* Exhibit 13.

23. The Supplemental Share Purchase Agreement defines the "Oil and Gas Assets and Liabilities" as "those assets and liabilities of HW–GW and its subsidiaries (excluding any Consolidated Indebtedness but including, without limitation, assets and liabilities of HPC Inc.) habitually designated as part of the oil and gas division of such corporations, which assets and liabilities as at August 31, 1985 were those set forth in Schedule D annexed [to the Supplemental Share Purchase Agreement]." *See* Exhibit 13 at p. 3. "Consolidated Indebtedness" is defined as "any and all consolidated oil and gas related indebtedness for borrowed money of HW–GW and its subsidiaries plus $20,000,000." *Id.*

Lyons that was to be the successor to HW–GW ("new HW–GW").[24] The Option Agreement granted to HPC the "put" option described above. On October 1, 1988, Gulf Canada, Allied–Lyons, HPC, and new HW–GW entered into a Memorandum of Understanding (the "Memorandum of Understanding"), which constituted notice to Gulf Canada that HPC was exercising the option and which provided that the closing of the asset sale would occur on December 15, 1988.[25] Gulf Canada designated TS Inc. ("TS"), as the subsidiary that would purchase the Oil and Gas Assets and Liabilities.[26] Prior to or simultaneous with the closing, HPC merged with its subsidiary, Home Petroleum, with HPC as the surviving corporation,[27] and TS changed its name to Home Petroleum Corporation ("TS/Home").[28] On December 15, 1988, HPC and TS/Home entered into a General Assignment, Bill of Sale and Conveyance (the "Sale Agreement"), whereby HPC assigned to TS/Home the assets of HPC and TS/Home assumed certain obligations and liabilities of HPC (the "Asset Sale").[29]

## C. Office of Conservation Order No. 738–2:

In July 1992, the Commissioner of Conservation for the State of Louisiana (the "Commissioner") gave legal notice that a public hearing would be held on August 5, 1992, whereby the Commissioner would afford all interested persons the opportunity to present evidence bearing upon the determination of the owner or owners responsible for plugging and abandonment in accordance with the provisions of Statewide Order No. 29–B, Section XIX (LAC 43:XIX.137), of the wells located on West Delta Block 27, the removal of all equipment, structures, and trash, and general site cleanup as required by section 30:4(C)(1) and (J) of the Louisiana Revised Statutes. The Commissioner sent notices of the hearing to all persons who had been operators of record of the wells on State Lease 7027—namely, Spartan, Davis Fuel, Home Petroleum, and Davis Oil.[30] Apparently, no one other than Davis Oil attended the hearing.[31]

On August 31, 1992, the Commissioner issued Office of Conservation Order No. 738–2, finding that Davis Oil was an operator of record with respect to the wells in question and is an "owner" as defined in section 30:3 of the Louisiana Revised Statutes.[32] Based upon these findings, the Commissioner found that Davis Oil was a responsible party and that any contracts that Davis Oil might have with third parties regarding liability for clean-up or regulatory matters did not affect the Commissioner's authority and duty to carry out his responsibilities under section 30 of the Louisiana Revised Statutes.[33] In accordance with these findings, the Commissioner ordered Davis Oil to plug and abandon the wells on the Lease in accordance with Statewide Order No. 29–B, Section XIX (LAC 43:XIX.137), to remove all equipment, structures, and trash associated with the Lease, to retrieve all surface contamination in existence at the time of well and platform abandonment, and to properly dispose of all such surface contamination, in accordance with Statewide Order No. 29–B, Section VIII.E & F (LAC 43:XIX.115.E & F) and section 30:4(C)(1) of the Louisiana Revised Statutes, not later than February 5, 1993.[34]

On October 27, 1992, Davis Oil filed suit against the Commissioner in the 19th Judicial District Court, for the Parish of East Baton Rouge, seeking, among other things, judgment declaring Order 738–2 invalid and enjoining the Commissioner from enforcing the Order.[35] According to the parties' trial briefs, that proceeding has been stayed.

24. *See* Exhibit 5.

25. *See* Exhibit 6.

26. See Joint Trial Stipulations at ¶ 15.

27. *See* Exhibit 15b.

28. *See* Exhibit 14c.

29. *See* Exhibit 7.

30. *See* Exhibit 19.

31. *See* Exhibit 18.

32. *See* Exhibit 9.

33. *Id.*

34. *Id.*

35. *See* Exhibit 18.

Davis Oil filed the instant action on February 19, 1993.

## II. CONCLUSIONS OF LAW:

Plaintiff asserts that, in 1981, HPC assumed all obligations of Davis Oil under the Lease, including the obligations to plug and abandon the wells on the leased premises and to remove the structures and facilities serving the wells, and that these obligations were transferred to TS/Home in the 1988 Asset Sale. In its trial memorandum, defendant does not dispute that HPC expressly assumed the obligations of Davis Oil as Lessee under the Lease. Defendant does dispute, however, that any obligations with regard to State Lease 7027 were transferred to TS/Home in the 1988 Asset Sale. And, more specifically, defendant denies that it assumed any obligations that HPC might have owed to Davis Oil with regard to the Lease.

In addition to asserting that TS expressly assumed a personal obligation owed by HPC to Davis Oil to plug and abandon the wells on State Lease 7027, plaintiff also hints at two other rationales for requiring defendant to perform the obligations in question. First, plaintiff intimates that the plug and abandon obligations passed automatically to TS/Home in the Asset Sale, without any need for an express assumption, because TS acquired rights in the Lease. Second, plaintiff seems to suggest that defendant should be ordered to perform the obligations in question because it took the name of Home Petroleum and continued to run the oil and gas business of HPC. Although plaintiff cites no authority for either of these arguments, the Court will address each of them in turn before turning to the crux of this case—whether TS personally assumed the obligations in question.

### A. Real Obligations Attendant to State Lease 7027:

Among the obligations of Lessee under the Lease are the obligations "to plug and abandon all wells on the premises no longer necessary for operations or production" and "to remove from the premises all structures and

facilities serving said wells." [36] Arguably, these covenants gave rise to "real obligations" under Louisiana law, which were transferred automatically to each successor who acquired an interest in the Lease.[37] Plaintiff suggests that TS is responsible for the plug and abandon obligations with respect to the Lease, even if TS did not personally assume any obligations of HPC with regard to the Lease, because TS acquired HPC's interest in the Lease.

The premise of plaintiff's argument is that the 1982 assignment from Home Petroleum and ENI to Davis Fuel was without effect because, according to the affidavit of plaintiff's counsel, the public records do not reflect any transfer of the rights under the Lease from HPC to its subsidiary, Home Petroleum. Although plaintiff cites no authority for this proposition, plaintiff's argument appears to be that this glitch in the public records caused HPC to retain ownership of the Lease until the Asset Sale in 1988 and, thus, that the Lease was among the assets transferred to TS. This argument must fail for several reasons.

■ First, because the affidavit of plaintiff's counsel was not among the stipulated trial exhibits, it would be grossly unfair for the Court to consider this statement regarding the legal ramifications of documents contained or not contained in the conveyance records of Plaquemines Parish. Certainly, if defense counsel had known that the plaintiff would attempt to introduce this "evidence" in connection with its reply memorandum, then the defendant would have offered rebuttal evidence or, in the very least, would have addressed the affidavit in its trial brief. Perhaps the defendant would have deemed it necessary to obtain its own title expert. Introduction of the affidavit might even have altered the defendant's decision to submit this matter without live testimony.

■ Second, even if this Court were to consider the affidavit, the argument is without merit. Under the public records doc-

---

36. See Exhibit 1 at ¶ 12.

37. See Joslyn Manufacturing Co. v. Koppers Co., Inc., 40 F.3d 750, 756 (5th Cir.1994); Chevron

U.S.A., Inc., v. Traillour Oil Co., 987 F.2d 1138, 1159 (5th Cir.1993).

trine, as embodied in Louisiana's Revised Statutes, "[n]o sale, contract, ... or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry."[38] However, the protection of the public records doctrine is not available to simply anyone in whose interest it is to have an agreement declared void. The "third persons" or "third parties" protected by the registry law are those "dealing with" immovable property or "acquiring any real or personal right, privilege or permit relating to or affecting immovable property"—e.g., subsequent purchasers, assignees, or mortgagees.[39] Plaintiff is not such a person or party. Thus, even if the alleged title defect is such that a subsequent assignee could have used it to defeat the interests of Davis Fuel, Spartan, and their successors, it is of no avail to plaintiff.

■ Third, the assignment to Davis Fuel was valid between the parties thereto, was approved by the State Mineral Board pursuant to statute,[40] and was recorded in the conveyance records of Plaquemines Parish, as were the 1983 assignment from Davis Fuel to Spartan and the subsequent assignments from Spartan to its assignees.[41] Accordingly, the Court finds that, for all purposes relevant to resolution of the controversy before this Court, the assignment to Davis Fuel in 1982 was valid and effective. Thus, HPC owned no right or interest in the Lease in 1988, TS acquired no

rights in the Lease, and no real obligations attendant to the Lease passed to TS by virtue of the asset sale.

■ Finally, even if TS had acquired an interest in the Lease, any real obligations that would have passed to TS solely by virtue of such an acquisition would have run only in favor of the State, by and through the Mineral Board, as Lessor. Such obligations would not include any personal obligations that might have been owed by HPC to Davis Oil.[42] Thus, even if the Court were to accept plaintiff's argument that TS acquired rights in the Lease, it would not alter the analysis.

### B. Corporate Successor Liability:

■ Plaintiff also suggests, rather obliquely, that defendant should be held responsible for plug and abandon liability on grounds that TS/Home adopted Home Petroleum's name and continued to operate the oil and gas business of HPC. The thrust of plaintiff's arguments in this regard appears to be that circumstances surrounding the Asset Sale are alone sufficient to give rise to liability.[43] Yet, plaintiff's memoranda are void of any authority—from any jurisdiction[44]—to support such a theory, and the record contains no evidence indicating that the Asset Sale was anything other than what it purported to be with both parties surviving the transaction as separate, viable corporations.[45] Thus, TS/Home's use of Home Petroleum's name and continuation of the oil and gas business car-

---

38. La.Rev.Stat.Ann. § 9:2721 (West 1991 & Supp.1996).

39. La.Rev.Stat.Ann. § 9:2722 (West 1991 & Supp.1996).

40. See La.Rev.Stat.Ann. § 30:128 (West 1989 & Supp.1996).

41. See supra at pp. 877–878.

42. See Chevron U.S.A., Inc., v. Traillour Oil Co., 987 F.2d 1138, 1159 (5th Cir.1993).

43. See, e.g., Sinclair Refining Co. v. Rayville Motor Co., Inc., 160 So. 179 (La.Ct.App.1935) (plaintiff seeking to impose liability where shareholders of original company organized second company, which purchased certain of original company's assets).

44. In her Order and Reasons, issued in this matter on August 15, 1994, Judge Ginger Berrigan concluded that, although Louisiana law would be applied to determine plaintiff's right to proceed against defendant, Ontario law would govern interpretation of the Sale Agreement. See Order & Reasons at n. 1. Plaintiff has pointed the Court to no authority from either Louisiana or Ontario to support a finding of corporate successor liability absent an agreement by TS/Home to assume the obligations in question.

45. Prior to merging with its parent company, Home Petroleum was an Oklahoma Corporation. See Joint Trial Stipulations at ¶ 3. TS was incorporated in Georgia as the Tensar Corporation. See Joint Trial Stipulations at ¶ 4. Although it changed its name to TS Inc. in 1982, to Home Petroleum Corporation in 1988, and to TS, Inc. in 1991, TS has remained a Georgia Corporation. Id.

ried on by HPC do nothing to alter the course of the analysis. If defendant is responsible for performing the obligations that plaintiff seeks to enforce, it must be because TS/Home assumed such obligations in writing.

## C. *Express Assumption:*

Under Louisiana law, "[a]n obligor and a third person may agree to an assumption by the latter of an obligation of the former."[46] "To be enforceable by the obligee against the third person, the agreement must be in writing."[47] Plaintiff argues that TS/Home did agree in writing to assume the obligations to plug and abandon all wells and remove all structures and facilities on the premises subject to State Lease 7027. According to plaintiff, this assumption can be found in the Sale Agreement.

### 1. *The General Assumption Language:* Plaintiff argues that the assumption of the obligations in question is encompassed in the general assumption language of the Sale Agreement, which reads as follows:

And for the same [$100.00 and other good and valuable] consideration, Assignee [TS/Home] hereby assumes, subject to the Option Agreement and Memorandum of Understanding, the following obligations and liabilities:

1. All obligations of Assignor [HPC] to deliver oil, gas or other minerals pursuant to any balancing agreement, gas purchase agreement or other agreement to compensate any party for any previous over-production by Assignor or for any "take-or-pay" or other advance payment;

2. All obligations and liabilities of Assignor at the Effective Date [December 15, 1988][48] that have arisen in the ordinary course of its business;

3. All obligations to past or present employees of Assignor in respect of accrued pay and salaries, commissions, vacation and holiday pay, workman's compensation levies, statutory and other withholding deductions, other payroll deductions including union dues and pension plan contributions; and

4. All liabilities and obligations under equipment (including without limitation, data processing) or real property leases or licenses or contracts therein entered into by HPC in the ordinary course of business.[49]

Although it has been determined that Ontario law should govern the interpretation of the Sale Agreement,[50] both plaintiff and defendant refer the Court exclusively to Louisiana law on this issue. The cases cited by plaintiff[51] offer nothing to the instant inquiry beyond the general principles enunciated in the Code articles—namely, that where the language of a written contract expresses the parties' intent that one party assume the obligation of another, such an agreement is enforceable by the parties and by the obligee. The cases offered by defendant are likewise of little assistance. Defendant cites *Chevron U.S.A., Inc. v. Traillour Oil Company*[52] and *Joslyn Manufacturing Co. v. Koppers Company, Inc.*,[53] extracting from them the precept that an obligation is not assumed unless it is specifically identified in the contract language. Indeed, there can be no dispute that none of the documents facilitating the Asset Sale contain any specific reference to State Lease 7027, to plug and abandon liability, or to any obligations owed to Davis Oil. However, the reasoning of *Chevron* and *Joslyn* simply cannot support the sweeping prohibition against general assumptions that defendant advocates. Rather, the rule of interpretation followed by the Fifth Circuit in both *Chevron* and *Joslyn* is that the intent to assume an obligation must

---

46. La.Civ.Code Ann. art. 1821 (West 1987).

47. *Id.*

48. The term "Effective Date" is defined as December 15, 1988. *See* Exhibit 7 at 1.

49. Exhibit 7 at 4–5.

50. *See* Order and Reasons, *supra* note 44, at 1.

51. *See, e.g., McCrory v. Terminix Serv. Co., Inc.*, 609 So.2d 883 (La.Ct.App.1992); *Hardy v. Whitney*, 480 So.2d 766 (La.Ct.App.1985).

52. 987 F.2d 1138 (5th Cir.1993).

53. 40 F.3d 750 (5th Cir.1994).

be "clearly expresse[d]"[54] and "apparent from the face of the documents."[55] Thus, the question for the Court remains whether the contract language describing the liabilities assumed by TS/Home encompasses the obligations in question.

Plaintiff maintains that the alleged assumption can be found in paragraphs 2 and 4 of the assumption provision quoted above. In other words, plaintiff argues that HPC's obligation to plug and abandon wells and remove structures and facilities on State Lease 7027 was both an obligation under a real property lease and an obligation that, as of December 15, 1988, had arisen in the ordinary course of HPC's business.

■ a. *Obligations under Real Property Leases:* Plaintiff's first argument, that the obligations in question are obligations under a real property lease, can be dismissed expeditiously, for it is evident from other provisions in the Sale Agreement that when the parties referred to oil and gas leases they used the term "oil and gas leases."[56] In fact, the parties labelled oil and gas leases or oil, gas and mineral leases as "the Leases" and used the capitalized term throughout the agreement to designate oil and gas leases or oil, gas and mineral leases.[57] Moreover, in describing the assets conveyed, the rights associated with the oil and gas leases and oil, gas and mineral leases (the "Leases") are set out in paragraph 1, separately from those associated with "property leases" and "equipment leases," which are listed in paragraph 18.[58] Thus, while the term "real property leases" in other circumstances might be construed to include an oil and gas lease such as State Lease 7027, it is clear that the parties to the Sale Agreement did not intend such a meaning.

b. *Obligations That Had Arisen as of December 15, 1988 in the Ordinary Course of HPC's Business:* Plaintiff's latter argument, however, that HPC's obligation to plug and abandon wells on State Lease 7027 was an obligation that had arisen in the ordinary course of HPC's business, requires closer scrutiny. Under the terms of the Lease, the Lessee is obligated "to plug and abandon all wells on the premises no longer necessary for operations or production" and "to remove from the premises all structures and facilities serving said wells."[59] The record reflects that the Lease expired according to its own terms in September 1985 due to the failure to conduct operations or produce oil, gas, or other minerals on the leased property.[60] Thus, plaintiff argues that the obligations of Lessee set forth in paragraph 12 of the Lease Agreement had arisen in the ordinary course of HPC's business not later than September 1985.

■ In its trial memorandum, defendant does not dispute that the obligations at issue would have been obligations arising in the ordinary course of HPC's business. Nor does defendant dispute that the plug and abandon obligations under the Lease had "arisen" as of 1985.[61] Instead, defendant argues that these obligations were not owed by Davis Oil or HPC, but were owed solely by those persons who held rights in the Lease at the time the Lease expired (*i.e.,* Spartan and its assignees). According to defendant, neither Davis Oil nor HPC had any obligation to plug and abandon until the Commissioner of Conservation made demand upon Davis Oil to perform the plugging and site clean-up obligations of an "owner" under section 30:4(C)(1).

In support of this argument, defendant cites only section 30:4(C)(1)(b) of the Louisi-

54. *Joslyn,* 40 F.3d at 758.

55. *Chevron,* 987 F.2d at 1159. Because the parties cite only Louisiana jurisprudence and Fifth Circuit decisions applying Louisiana law, the Court must assume that Ontario law, to the extent it is applicable to interpretation of the Sale Agreement, is not inconsistent and would dictate a similar task for the Court—namely, discerning the intent of the parties from the plain language of the contract.

56. *See* Exhibit 7 at 1.

57. *See id.* at 1–3, 5.

58. *See id.* at 1, 4.

59. *See* Exhibit 1 at ¶ 12.

60. *See* Joint Trial Stipulations at ¶ 12.

61. *See* defendant's Trial Brief at 14.

ana Revised Statutes, which provides that "[o]nly an owner ... shall be held or deemed responsible for the performance of any actions required by the commissioner," [62] and section 30:3(8), which defines "owner" as "the person, including operators and producers acting on behalf of the person, who has or had the right to drill into and to produce from a pool and to appropriate the production either for himself or for others." [63] Although defendant does not complete the argument, the implication is obvious: neither HPC nor Davis Oil were obligated prior to 1992 to perform the obligations of paragraph 12 because only an "owner" may be held liable by the Commissioner for plugging and abandonment and term "owner" does not include previous owners.

Two of the investors in *Chevron* presented a similar argument to the Fifth Circuit. They argued that the language in section 30:4(C)(1) providing that only an "owner" may be held liable by the Commissioner "rendered moot any case or controversy respecting the parties' [contractual] liability for plugging and abandoning wells." [64] The Fifth Circuit rejected this argument, finding that "it ignore[d] the express promise made by Chevron's predecessor [the original lessee], in its original lease ... to 'plug and abandon all wells on the released and surren-

dered acreage in accordance with the rules and regulations of any governmental agency, official or department having jurisdiction.' " [65] Accordingly, the Fifth Circuit held that the "only an owner" provision of section 30:4(C)(1) "[did] not ... affect Chevron's obligation under the original lease ... to plug and abandon the wells." [66] Likewise, this Court finds that whether HPC or Davis Oil could have been held liable by the Commissioner under section 30:4(C)(1) (before or after December 15, 1988) is irrelevant to whether, as of December 15, 1988, HPC owed a contractual obligation to perform the contractual plug and abandon obligations set forth in paragraph 12 of the Lease Agreement.[67]

Under the Mineral Code, when a lessee assigns his interest in a mineral lease to another, the assignee "acquires the rights and powers of the lessee and becomes responsible directly to the original lessor for performance of the lessee's obligations." [68] However, the assignor "is not relieved of his obligations or liabilities under a mineral lease unless the lessor has discharged him expressly and in writing." [69] The record reveals no evidence (and defendant does not argue) that the State, as Lessor, released either Davis Oil or HPC from their obligations under the Lease.[70] Thus, both of

62. La.Rev.Stat.Ann. § 30:4(C)(1)(b) (West Supp. 1996).

63. La.Rev.Stat.Ann. § 30:3(8) (West Supp.1996).

64. *Chevron*, 987 F.2d at 1153.

65. *Id.*

66. *Id.*

67. In addition, it is obvious from Order No. 738-2 that, contrary to defendant's position, the Commissioner of Conservation has construed the term "owner" to include previous owners. It appears from plaintiff's petition for judicial review of Order No. 738-2 that the propriety of the Commissioner's position in this regard is now pending before the state court. This Court is confident that if resolution of this contract matter had hinged on the appropriateness of a state regulatory authority's interpretation of a state regulatory statute, the need for abstention in favor of the previously filed state court action would have been raised prior to submission of this matter.

68. La.Rev.Stat.Ann. § 31:128 (West 1989).

69. La.Rev.Stat.Ann. § 31:129 (West 1989); *see also* Saúl Litvinoff, *Law of Obligations*, 5 *Louisiana Civil Law Treatise* §§ 10.13–10.14 (1992) ("[T]he assumption of an obligation by a third person does not effect a novation, unless the obligee clearly expresses his intention to regard the original obligation as extinguished and accept in lieu thereof a new obligation of the third person.").

70. The lessor's consent to the assumption agreement does not effect a release of the assignor. *See* La.Civ.Code art. 1821 (West 1987). Thus, although the State Mineral Board did consent by resolution to the assignments to HPC and to Davis Fuel, this alone did not operate to discharge any obligor. *See* Exhibits 4 and 16c. In fact, both resolutions expressly provide that the Mineral Board did not recognize either of the respective assignments as creating a novation. *Id.* Clearly, none of the assignments, assumptions, or resolutions at issue here acted to extinguish the obligations owed to the State, as Lessor, by Davis Oil and HPC.

them remained contractually bound to perform the obligations of Lessee under the Lease, including those set forth in paragraph 12.

■ That the State, as Lessor, made no demand on Davis Oil or HPC prior to (or subsequent to) December 15, 1988 is of no moment, for the Lease Agreement neither provides nor implies that the obligations of paragraph 12 are contingent upon demand.[71] Rather, under the plain language of the Lease Agreement, the obligations of paragraph 12 were owed from the moment that the wells on the premises subject to the Lease became no longer necessary for operations or production.[72] This occurred not later than September 1985, when the Lease terminated according to its own terms due to the failure to conduct operations or produce oil, gas, or other minerals on the leased property. Accordingly, in September 1985 (if not earlier), both Davis Oil and HPC, along with all subsequent assignees, became solidarily obligated to the State, as Lessor, to perform the obligations set forth in paragraph 12 of the Lease Agreement. Thus, the Court concludes that the obligations of paragraph 12 are obligations that, as of December 15, 1988, had "arisen" in the ordinary course of HPC's business.

■ This does not end the Court's inquiry, however, for the question before the Court is not whether TS/Home assumed obligations owed by HPC to the State, as Lessor, but whether TS/Home assumed plug and abandon obligations owed by HPC *to Davis Oil.* And, as the Fifth Circuit in *Chevron* made clear, the assumption of plug and abandon obligations owed by one's assignor to the

original lessor does not bring with it an assumption of contractual obligations owed by the assignor to his predecessor in interest, unless this latter assumption "is apparent from the face of the documents."[73] Here, the obligations owed by HPC to the State are separate and distinct from those owed by HPC to Davis Oil. The former arise out of the Lease Agreement. The latter arise out of the Purchase Agreement, entered into between Davis Oil and HPC in 1981,[74] and related documents, specifically HPC's joinder in the Assignment and Bill of Sale.[75] The memoranda of both plaintiff and defendant implicitly acknowledge that for plaintiff to prevail, TS/Home must have assumed the latter. Thus, in determining whether the general assumption language of the Sale Agreement can serve as a basis for requiring defendant to perform the obligations in question, the relevant inquiry is whether, as of December 15, 1988, HPC owed *to Davis Oil* an obligation to perform the obligations of Lessee set out in paragraph 12 of the Lease Agreement.[76] Neither plaintiff nor defendant fully analyze this issue.

As stated above, the obligations owed by HPC to Davis Oil arise out of the Purchase Agreement and related documents entered into between Davis Oil and HPC.[77] The assumption language of the Purchase Agreement provides as follows:

> Section 2.14 *Assumption of Certain Obligations.* Subject to the other provisions hereof, Buyer [HPC] agrees to assume and will pay, perform and discharge all obligations of Seller [Davis Oil] relating to the Properties to the extent such obligations (a) are attributable to the Proper-

---

71. Nor does defendant cite any law dictating that the obligations would become operative only upon demand.

72. The Court notes that the obligations of paragraph 12 are made "subject to compliance with laws, rules and regulations." *See* Exhibit 1 at 6. However, defendant cites no law of Louisiana or rule or regulation of the Commissioner of Conservation or any other regulatory authority that would operate to prevent the contractual obligations of paragraph 12 from becoming operative when the wells "became no longer necessary for operations or production." *Id.*

73. *Chevron,* 987 F.2d at 1159.

74. *See* Exhibit 2.

75. *See* Exhibit 3.

76. Defendant apparently concedes that such obligation would be an obligation arising in the ordinary course of HPC's business, as it does not argue otherwise. Accordingly, the Court assumes that this prong of the Sale Agreement assumption language is satisfied.

77. *See* Exhibit 2.

ties, and (b) attributable to any time or period of time after the Effective Time, and (c) arise out of legally binding obligations to which the Properties are shown to be subject in the documents pursuant to which conveyances are made to Buyer hereunder, and (d) which are not the subjects of Title Defects or breaches of any representation or warranty of Seller hereunder. Notwithstanding the foregoing, Buyer shall take title to the Properties subject only to such matters that relate specifically to the Properties and such matters shall not include any contractual arrangements personal to the Seller or any documents evidencing or securing any indebtedness of the Seller or of any predecessor in title to the Seller;.... [78]

Pursuant to the Purchase Agreement and the Assignment and Bill of Sale executed in connection therewith, HPC executed a document entitled "Joinder of Assignee in Assignment," whereby HPC "expressly assume[d] the obligations of lessee under the terms of [certain oil, gas, and mineral] leases [including State Lease 7027], and agree[d] to be bound thereby." [79]

■ Defendant does not deny that HPC did assume and promise Davis Oil that it would "pay, perform and discharge" the obligations of lessee under State Lease 7027, including the obligations of paragraph 12. Certainly, such obligations are attributable to the "Properties," [80] attributable to a period of time after the "Effective Time" of 7:00 a.m. on January 1, 1981, and arise out of legally binding obligations set forth in the Lease

Agreement, which is referenced in Exhibit A to the Purchase Agreement. And, without question, they are "obligations of lessee" under the terms of the Lease. The question in dispute is when did the obligation owed by HPC to Davis Oil to perform the obligations of paragraph 12 "arise."

Plaintiff argues that it "arose" when the Purchase Agreement became effective on January 1, 1981, or, alternatively, in 1985 when Davis Oil, HPC, and the subsequent assignees became obligated vis-à-vis the State to perform the contractual obligations set out in paragraph 12. Defendant does not put forth directly any interpretation of the term "arisen," but implicit in defendant's argument on this point (that the obligations in question had not arisen as of December 15, 1988 because they were not owed by either HPC or Davis Oil at that time) is the presumption that an obligation arises when it becomes owed. The Court agrees.

HPC's obligation to Davis Oil with respect to the Lease was to "pay, perform and discharge" the obligations of lessee. Nothing in the Purchase Agreement suggests that this obligation was contingent upon a finding of regulatory liability against Davis Oil or even upon a demand being made against Davis Oil by the Commissioner, the State as Lessor, or by anyone else.[81] Nor is the obligation made subject to demand being made by Davis Oil against HPC. Rather, under the plain language of the Purchase Agreement, HPC's obligation to Davis Oil was simply to perform the obligations of lessee.[82] As the obligations

---

**78.** Exhibit 2. The term "the Properties" is defined as including "[a]ll of the oil, gas and other mineral properties, rights and undivided interest, including but not limited to, leasehold ... interests, owned by Seller, in whole or in part, ... within the outlined areas ... on the maps and plats attached hereto as Exhibit A," and would include State Lease 7027. *Id.* at 1–2, § 102(a). The term "Effective Time" is defined as 7:00 a.m. on January 1, 1981. *See id.* at 4, § 1.05.

**79.** *See* Exhibit 3.

**80.** The Lease is encompassed in the definition of "Properties." *See supra* note 78.

**81.** The Court notes that the parties provided for the application of Texas law to the Purchase Agreement. *See* Exhibit 2 at § 13.07. Judge Berrigan's Order and Reasons of August 15, 1994

suggests that, although Louisiana law would govern plaintiff's right to proceed against defendant, the choice of law provisions in both the Purchase Agreement and the Sale Agreement would be enforced. However, neither party cites any authority, from either Texas or Louisiana, that would dictate a different interpretation of the Purchase Agreement.

**82.** Although the lack of demand against either Davis Oil or HPC presents conceptual difficulties, it does not change the fact that the obligation was owed. In *Chevron,* one of the assignees argued that Chevron's plug and abandon indemnity claims were not ripe for review "because no one ha[d] yet threatened to require Chevron to plug and abandon the wells." *Chevron,* 987 F.2d at 1153. The Fifth Circuit disagreed and found that the declaratory judgment

of lessee under paragraph 12 became owed in September 1985, HPC's corresponding obligation to Davis Oil likewise became owed in September 1985. Accordingly, this Court finds that the obligation owed by HPC to Davis Oil to perform the obligations of lessee set forth in paragraph 12 was an obligation that had arisen as of December 15, 1988 in the ordinary course of HPC's business.

**2. *Exceptions to the General Assumption Language:*** The Court's inquiry is not complete, however, for defendant argues that, even if HPC's obligation to Davis Oil is encompassed within the general assumption language discussed above, it was not assumed by TS/Home because it was expressly excluded in the paragraph of the Sale Agreement immediately following the general assumption language. This exception provision reads:

> Except to the extent expressly assumed or required to be assumed pursuant to this Assignment, the Option Agreement or the Memorandum of Understanding, the liabilities assumed by Assignee hereunder shall not include, and Assignee shall not assume or in any way be liable or responsible for (a) any liability or obligation of any kind incurred by or on behalf of Assignor after the Effective Date (b) any liability or obligation which may in the future be asserted against Assignee arising out of, resulting from or in connection with, Assignor's operation of its business and (c) any liability or obligation of any kind to any shareholder of Assignor to any corporation, entity or person related to or affiliated with such a shareholder.[83]

Defendant argues that HPC's obligation to Davis Oil falls into categories (a) and (b). In other words, defendant argues that it is: 1) an obligation that was incurred by HPC after December 15, 1988, and 2) an obligation arising out of HPC's operation of its business that was asserted against TS after December 15, 1988. The former contention is based upon the exact reasoning as that offered by defendant to support its argument that HPC's obligation to Davis Oil had not "arisen" as of December 15, 1988 and, therefore, must be rejected on the same grounds as that argument. The latter argument is more compelling. Davis Oil did not make demand upon TS regarding the obligation at issue until August 13, 1992, nearly four years after the Effective Date.[84] And, according to plaintiff's own argument (that the obligation owed by HPC to Davis Oil arose in the ordinary course of HPC's business), the obligation did arise out of HPC's operation of its business. Thus, the obligation owed by HPC to Davis Oil clearly meets the plain requirements of category (b).

Plaintiff, however, focuses on part of the first clause of the exclusionary language: "Except to the extent expressly assumed ... pursuant to this Assignment ..." According to plaintiff, HPC's obligation to Davis Oil is not excluded under category (b), although it was asserted after the Effective Date, because it was expressly assumed in the Sale Agreement. In addition, plaintiff also argues that exclusionary clause (b) does not apply because it was intended solely to protect TS from assuming obligations relating to HPC's past or future operation of its ongoing liquor business. The Court disagrees.

Plaintiff's first argument, that the obligation in question is not excluded because it had arisen as of December 15, 1988, would render exclusionary clause (b) utterly meaningless. If an obligation does not fall within one of the categories of assumed obligations, then there is no need to reach the exclusionary language, for it is not assumed regardless of when it is asserted. If an obligation does fall within one of the categories of assumed obligations, then clause (b) would become inoperative under plaintiff's reasoning. Thus, clause (b) of the exclusionary language

---

action was ripe for adjudication because there was "substantial possibility" that Chevron would be required to plug and abandon the wells. *Id.* at 1154. Similarly, while it may be conceptually awkward to speak of HPC's obligation as due and owing in 1988 when neither the State nor Davis Oil had demanded performance, the obligation was nonetheless owed under the plain

language of the Lease Agreement and the Purchase Agreement.

**83.** Exhibit 7 at 5.

**84.** *See* Joint Trial Stipulations at ¶ 17.

would never apply. This cannot have been what the parties intended.

The general assumption language of the Sale Agreement contains four categories of assumed obligations:

1. All obligations of Assignor [HPC] to deliver oil, gas or other minerals pursuant to any balancing agreement, gas purchase agreement or other agreement to compensate any party for any previous over-production by Assignor or for any "take-or-pay" or other advance payment;

2. All obligations and liabilities of Assignor at the Effective Date [December 15, 1988] that have arisen in the ordinary course of its business;

3. All obligations to past or present employees of Assignor . . . ; and

4. All liabilities and obligations under equipment . . . or real property leases. . . . [85]

The obligations described specifically in paragraphs 1, 3, and 4 are all subcategories of paragraph 2—obligations that had "arisen" as of December 15, 1988 in the ordinary course of HPC's business.[86] Unlike the obligations described generally in paragraph 2, however, they are described explicitly. If the phrase "expressly assumed . . . pursuant to this Assignment" is read to refer to these specifically described obligations, then the exclusionary language makes sense. Although these obligations had not been asserted as of December 15, 1988, it was foreseen by the parties that they almost certainly would be asserted against TS/Home "in the future." These obligations, therefore, were exempted from the provision excluding obligations asserted after the Effective Date. As this is the only interpretation of the phrase that does not render the exclusionary language meaningless, it is the only reasonable interpretation. Thus, plaintiff's argument that the exclusionary language does not apply because the obligation in question is "expressly assumed" in the Sale Agreement cannot succeed.

 Plaintiff's second argument, that exclusionary clause (b) does not apply because it was intended to protect TS from assuming obligations relating to HPC's past or future operation of its ongoing liquor business, also must fail. Certainly, nothing in the Sale Agreement or elsewhere in the record supports this strained interpretation. Moreover, this Court can find no evidence in the record that HPC ever operated a liquor business. Plaintiff, however, points to the following provisions of the Memorandum of Understanding:

(m) Other Assumed Liabilities [87]

Without limiting the provisions of the [Option] Agreement or the foregoing provisions hereof but subject as hereinafter provided in this Section (m), the following liabilities shall be part of the Oil and Gas Assets and Liabilities: [88]

(i) except as contemplated herein, all obligations and liabilities of HPC and its subsidiaries at Closing [December 15, 1988],[89] whether or not contingent, that have arisen in the ordinary course of the oil and gas business of HPC or any of its subsidiaries carried

---

85. Exhibit 7 at 4–5.

86. The obligations described in paragraphs I and 4 must mean those obligations arising prior to December 15, 1988, because on that date HPC transferred to TS/Home all of its interest in balancing agreements, purchase agreements, equipment leases, and real property leases. Thus, any obligation arising under such agreements and leases after December 15, 1988 would be the obligation of TS/Home, not "of Assignor." Similarly, the obligations described in paragraph 3 must mean those obligations arising prior to December 15, 1988, for the exhaustive list of obligations due HPC employees is prefaced by the term "accrued."

87. Section (m) is captioned "other" assumed liabilities because sections earlier in the Memorandum of Understanding provide that certain liabilities (i.e., contingent cash-balancing liability and adjustments under joint venture arrangements) be included in the Oil and Gas Assets and Liabilities. See Exhibit 6 at §§ (i) and (k).

88. Assumption of the liabilities forming part of the Oil and Gas Assets and Liabilities was part of the purchase price for the Oil and Gas Assets and Liabilities. See Option Agreement, Exhibit 5 at § 1. Thus, section (m) of the Memorandum of Understanding is setting out the obligations that TS/Home was required to assume.

89. See Exhibit 6 at § (c).

on with the Oil and Gas Assets and Liabilities; ...

(iv) except as contemplated herein, all liabilities and obligations accruing or falling due after closing, whether or not contingent, in relation to the oil and gas business theretofore conducted by HPC or any of its subsidiaries carried on with the Oil and Gas Assets and Liabilities.[90]

Plaintiff argues that these provisions demonstrate beyond question that the parties intended that TS/Home would assume any and all obligations incurred prior to December 15, 1988, whether or not such obligations were contingent or should accrue or fall due thereafter, so long as they related to the oil and gas business theretofore conducted by HPC. Plaintiff's argument, however, ignores the last phrase of subsections (i) and (iv): "carried on with the Oil and Gas Assets and Liabilities."

If this phrase is to be given any meaning at all, then subsections (i) and (iv) cannot be read as encompassing HPC's obligation to Davis Oil. Because HPC owned no rights in State Lease 7027, the obligation does not relate to or arise out of any business carried on by HPC with the assets constituting the Oil and Gas Assets and Liabilities. And, although the argument could be made that the obligation in question relates to business carried on with the liabilities constituting the Oil and Gas Assets and Liabilities, this argument is circular and leads nowhere, for section (m) defines the liabilities that are to make up the Oil and Gas Assets and Liabilities.[91] In essence, the argument would be

that the obligation in question falls within subsection (i) or (iv) because it meets the requirements of that subsection if the last phrase is ignored. Such an interpretation is nonsensical and renders the phrase at issue meaningless. Thus, the parties must have intended the phrase to mean business carried on with the assets forming part of the Oil and Gas Assets and Liabilities.[92]

The Memorandum of Understanding, therefore, does not support the plaintiff's argument that exclusionary clause (b) does not apply. Rather, the Memorandum of Understanding demonstrates that the parties intended TS/Home to assume all obligations, whether contingent or not, relating to the oil and gas business carried on by HPC with the assets that were to be purchased by TS/Home. That this was the parties' intent is further supported by the parties' choice of an asset sale rather than a stock purchase as the vehicle for transferring HPC's oil and gas business to TS. The Court concludes, therefore, that exclusionary clause (b) does apply. Accordingly, as the obligation owed by HPC to Davis Oil to perform the obligations of Lessee set forth in paragraph 12 of the Lease Agreement was not asserted until August 13, 1992, long after the Effective Date of the Sale Agreement, the Court concludes that TS/Home did not assume such obligation in the Asset Sale.

Moreover, because the Sale Agreement provides that the Memorandum of Understanding shall control any conflict between the Memorandum of Understanding and the

90. See Exhibit 6 at § (m).

91. Sections (i) and (k) also list certain narrow categories of liabilities (contingent cash-balancing liability and amounts payable by HPC in relation to adjustments under joint venture arrangements) that were to form part of the Oil and Gas Assets and Liabilities. See Exhibit 6 at §§ (i) and (k). However, these provisions do not aid plaintiff's argument, for HPC's obligation to Davis Oil does not arise out of or relate to any business carried on by HPC with balancing agreements or joint venture arrangements.

92. Throughout the Memorandum of Understanding, the parties use the term "Oil and Gas Assets and Liabilities" whether they are referring to the

assets that are to be conveyed or the liabilities that are to be assumed. See Exhibit 6 at §§ (g)-(l). However, in each case, it is clear from the context whether the parties are referring to the assets forming part of the Oil and Gas Assets and Liabilities or the liabilities forming part of the Oil and Gas Assets and Liabilities. For example, in sections (g) and (h), the parties describe certain payments that have been received by HPC and provide that these payments "shall not constitute a portion of the Oil and Gas Assets and Liabilities." In section (i) the parties set out the estimated amount of contingent cash-balancing liability and provide that this contingent liability "shall constitute a portion of the Oil and Gas Assets and Liabilities."

Sale Agreement,[93] the Court concludes that HPC's obligation to Davis Oil was not assumed by TS/Home for the additional reason that it did not arise out or relate to of any oil and gas business carried on by HPC with the assets constituting the Oil and Gas Assets and Liabilities.

Accordingly, IT IS ORDERED that judgment be entered against plaintiff Davis Oil Company and in favor of defendant TS, Inc.

Considering the foregoing, IT IS FURTHER ORDERED that defendant TS, Inc.'s claims against third-party defendant, Persidio Exploration, Inc., which have been severed from plaintiff's claims against defendant TS, Inc., as well as Persidio Exploration, Inc.'s third-party claims against ENI Oil & Gas Drilling Program–1976A, Davis Fuel Inc., Spartan Minerals Inc., Great Central Texas Oil & Gas, Inc., and Spartan Mineral West–Delta, Inc. are HEREBY DISMISSED without prejudice.